171

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF IOWA
 2                    DAVENPORT DIVISION

 3
   UNITED STATES OF AMERICA,        )
 4                                  )
              Plaintiff,            )
 5                                  )  ORIGINAL
              -vs-                  )  CRIMINAL NO. 3:08-cr-69
 6                                  )
   RICARDO TOWNSEND,                )  PARTIAL TRANSCRIPT
 7                                  )  OF PROCEEDINGS
              Defendant.            )  TRIAL DAYS TWO and THREE
 8                                  )

 9

10        PARTIAL TRANSCRIPT OF PROCEEDINGS, held before the

11   Honorable John Jarvey, at the Federal Courthouse, Davenport,

12   Iowa, commencing at 9:02 a.m., February 24, 2009, reported by

13   Linda Faurote-Egbers, Certified Shorthand Reporter and Notary

14   Public for the State of Iowa.

15

16                         APPEARANCES

17   Plaintiff by:              MELISA ZAEHRINGER
                                Assistant United States
18                              Attorney
                                131 East Fourth Street
19                              Davenport, IA  52801

20
     Defendant by:              MATTHEW ANDREW LEDDIN
21                              Attorney at Law
                                5108 Jersey Ridge Road
22                              Davenport, IA  52807

23

24   Reported by:

25   Linda Faurote-Egbers
     Certified Shorthand Reporter
```

INDEX

| Witness | Attorney | Page |
|---------|----------|------|
| Marci Stanfield | Ms. Zaehringer | 174 |
|  | Mr. Leddin | 180 |
|  | Ms. Zaehringer | 182 |
|  | Mr. Leddin | 190 |
| William Scott Schalla | Ms. Zaehringer | 197 |
|  | Mr. Leddin | 205 |
|  | Ms. Zaehringer | 215 |
| Mark Riley | Ms. Zaehringer | 217 |
|  | Mr. Leddin | 225 |
|  | Ms. Zaehringer | 227 |
|  | Mr. Leddin | 228 |
|  | Ms. Zaehringer | 230 |
| Daniel Davis | Ms. Zaehringer | 232 |
|  | Mr. Leddin | 246 |
|  | Ms. Zaehringer | 251 |
| Jess Bernhard | Ms. Zaehringer | 253 |
|  | Mr. Leddin | 267 |
| Jerry Blomgren | Ms. Zaehringer | 271 |
|  | Mr. Leddin | 295 |
|  | Ms. Zaehringer | 304 |

| Government's Exhibits | Offered | Received |
|-----------------------|---------|----------|
| 4 – Davis Proffer Agreement | 233 | 233 |
| 5 – Phone Records of Prince Ferguson | 283 | 283 |
| 6 – Certificate of Title for Mobile Home | 175 | 175 |
| 7 – Money Orders for Mobile Home | 175 | 175 |
| 10 – Holiday Court 3-07 Monthly Statement | 287 | 287 |
| 12 – Western Union Money Order | 287 | 287 |
| 13 – Crack Cocaine | 262 | 262 |
| 14 – Black Tar Heroine | 262 | 262 |
| 15 – Baggies | 262 | 262 |
| 16 – Digital Scale | 262 | 262 |
| 17 – Folgers Coffee Can | 262 | 262 |
| 18 – DCI Drug Analysis | 289 | 289 |
| 19 – DCI Fingerprint Analysis | 289 | 289 |
| 20B – Photo of Kitchen Area of Mobile Home | 258 | 258 |

1   20C – Photo of Box Containing Packaging
        Materials                            258        258
2   20D – Photo of Folgers Coffee Cans       258        258
    20E – Photo of Packaged Crack Cocaine    258        258
3   20F – Photo of Living Room of Mobile Home 258       258
    20G – Photo of Hallway of Mobile Home    258        258
4   20H – Photo of Bedroom of Mobile Home    258        258
    22 – Iowa ID of Townsend                 263        263
5   23 – Driver's License of Rice            263        263
    24 – Water Service Agreement             263        263
6   25A – Photo of Residence                 245        245
    25B – Photo of Residence                 245        245
7   26 – Stipulation                         293        293

8

9   Closing Arguments                                Page

10
    Ms. Zaehringer                                   313
11  Mr. Leddin                                       321
    Ms. Zaehringer                                   328
12

13

14

15

16

17

18

19

20  Certificate of Shorthand Reporter               339

21

22

23

24

25

1          (In the presence of the jury.)

2          THE COURT:  Please be seated.  Members of the jury,

3    good morning.  We are continuing on with the United States

4    versus Ricardo Townsend.  Ms. Zaehringer, would you please call

5    your next witness?

6          MS. ZAEHRINGER:  United States calls Marci Stanfield.

7                          MARCI STANFIELD,

8    witness herein, called as a witness by the government, after

9    having been first duly sworn, was examined and testified as

10   follows:

11         THE COURT:  When you are comfortably seated there,

12   would you pull closer to the microphone, you can bend the

13   microphone so it is close to your mouth, you can actually bend

14   that, tell us your name and spell your last name.

15         THE WITNESS:  Marci Stanfield, S-t-a-n-f-i-e-l-d.

16         THE COURT:  Go ahead.

17                          EXAMINATION

18   BY MS. ZAEHRINGER:

19      Q.   Where are you employed?

20      A.   At the Holiday Mobile Home Court in North Liberty,

21   Iowa.

22      Q.   How long have you worked there?

23      A.   Five years.

24      Q.   And what are your main duties there?

25      A.   I help run the office.

1      Q.   During this investigation did Detective Blomgren come

2   to the trailer park and get some documents from you?

3      A.   Yes, he did.

4      Q.   Showing you what's been marked as Government's

5   Exhibits 6 and 7, do you recognize those?

6      A.   Yes, I do.

7      Q.   And what do you recognize those to be?

8      A.   One is the Certificate of Title for the mobile home

9   and the other one is the money order in which the mobile home

10  was purchased with.

11     Q.   And do you keep these records?

12     A.   Yes.

13     Q.   And you gave these to Detective Blomgren?

14     A.   Yes, I did.

15          MS. ZAEHRINGER:  Move to admit Government's Exhibits 6

16  and 7.

17          MR. LEDDIN:  No objections, Your Honor.

18          THE COURT:  Received.

19  BY MS. ZAEHRINGER:

20     Q.   In looking at Exhibit 6, this is a Certificate of

21  Title?

22     A.   Yes.

23     Q.   And what does this document tell us as far as who owns

24  a certain property?

25     A.   Tells the make and the model of the mobile home, the

1    year, who the owner is, the previous owner.

2        Q.    And in this particular case Ricardo Townsend is the

3    owner of the trailer?

4        A.    Yes.

5        Q.    And the issue date is July 31, 2006?

6        A.    Yes.

7        Q.    And the second page is signatures?

8        A.    Yes.

9        Q.    The third page looks like a duplicate title?

10       A.    Yes.

11       Q.    And the issue date of that was what?

12       A.    12-3 of '07.

13       Q.    Did you know Ricardo Townsend to own a trailer in the

14   Holiday Mobile Home Park?

15       A.    Yes.

16       Q.    What trailer did he own?

17       A.    Lot No. 13.

18       Q.    This is Government's Exhibit 7.  What is this

19   document?

20       A.    Money order -- money orders that he used to purchase

21   the mobile home with.

22       Q.    And what is the statement date?

23       A.    8-1 of 2006.  I can't really read it.

24       Q.    It is kind of blurry.

25       A.    Yeah.

1    Q.    And what do these money orders show?

2    A.    That one, he paid 500 -- 500 and 139 I think the first

3  one was.

4    Q.    And this is when he first moved into the trailer or

5  first bought the trailer?

6    A.    When he first purchased it, yes.

7    Q.    The third page of document seven or Government's

8  Exhibit 7, what does this tell us?

9    A.    This is our application that we make them fill out so

10  that we know who will be in the mobile home.

11    Q.    And we have a name of Shonna Stanley?

12    A.    Yes.

13    Q.    Did she fill out this paperwork?

14    A.    She must have.

15    Q.    She didn't do it in your presence?

16    A.    No, she did not.

17    Q.    Then we have the co-applicant's name?

18    A.    Yes.

19    Q.    That is Ricardo Townsend?

20    A.    Yes.

21    Q.    Did he fill this portion out in front of you?

22    A.    Not that I remember.  Sometimes they take the

23  applications with them and bring them back later and drop them

24  in our drop box.

25    Q.    And we have a section here for personal references and

1  in case of emergency contacts?

2       A.   Yes.

3       Q.   And we have signatures down here, Shonna Stanley and

4  Prince Roshawn Ferguson?

5       A.   Yes.

6       Q.   And what is this last page here?

7       A.   That is our court rules and regulations.

8       Q.   And it is signed as well, correct?

9       A.   Yes.

10      Q.   Who needs to fill out the rules?

11      A.   Whoever is purchasing the mobile home and going to

12  reside there.

13      Q.   If, say, the persons listed on this document moved out

14  of the mobile home, would a new rules need to be signed by the

15  new occupants?

16      A.   Yes.

17      Q.   Did you have any other rules signed by anybody else

18  other than the two dated August 3rd of 2006?

19      A.   No.

20      Q.   How often are you at the mobile home park?

21      A.   Monday through Friday from 9:00 to 4:00.

22      Q.   Where is the office located in reference to trailer

23  number 13?

24      A.   Right across the street.

25      Q.   How was the monthly lot fees paid for number 13?

1    A.    He would usually drop it off in the drop box.

2    Q.    When you say he, who do you mean?

3    A.    Whoever lived there.

4    Q.    You don't -- you didn't see anybody making payments?

5    A.    Right, exactly.

6    Q.    You would just go to the office and a payment would be

7    in the box?

8    A.    Exactly.

9    Q.    And would it be a money order or would it be cash?

10   A.    Money order.

11   Q.    Do you recall how much the monthly lot rent is?

12   A.    It was 220 at the time.

13   Q.    Do you have knowledge on whether this trailer, number

14   13, was sold?

15   A.    It was after Ricardo left, yes.

16   Q.    Do you know when it was sold?

17   A.    Not right offhand, I do not know.

18   Q.    Do you know who it was sold to?

19   A.    Craig McConaughey.

20   Q.    During the time that you were working at the mobile

21   home park did you know who was residing at the trailer?

22   A.    No, I did not.

23   Q.    Did you look out to see whose car was there on a daily

24   basis?

25   A.    No, I did not.

1      Q.   Do you interact with people at the trailer park or do

2   you just let them do their own thing?

3      A.   They do their own thing.

4          MS. ZAEHRINGER:  I have no further questions.

5          THE COURT:  Mr. Leddin?

6          MR. LEDDIN:  Thank you, Your Honor.

7                        EXAMINATION

8   BY MR. LEDDIN:

9      Q.   Good morning, Ms. Stanfield.

10     A.   Good morning.

11     Q.   Ms. Zaehringer made reference to the Holiday Mobile

12  Home Court Rules and Regulations, I believe that was her Exhibit

13  6.  Shonna Stanley was one of the -- actually looks like the

14  person who filled out this application, is that correct?

15     A.   Yes.

16     Q.   And would it be fair to say that she was the primary

17  resident of the mobile home at lot Number 13?

18     A.   I could not say for sure who lived there.

19     Q.   Would it be fair to say though that the person who

20  fills out the application is usually going to be the primary

21  resident of that particular mobile home?

22     A.   That's supposed to be that way, but normally it's

23  whoever pays the lot rent.

24     Q.   And would it be fair to say that you don't know who

25  was paying the lot rent?

1      A.    I'm not sure.

2      Q.    And that it was actually money orders that were

3   dropped off at the -- was it the box at the --

4      A.    There's a drop box, yes.

5      Q.    Okay.  Great.  And it is also fair to say that you

6   never really even saw Ricardo Townsend much at that particular

7   mobile home?

8      A.    No, I did not.

9      Q.    In fact, you probably weren't really keeping track of

10  who was at the mobile home?

11     A.    No, I do not.

12     Q.    So it is fair to say that you really did not see Mr.

13  Townsend at all at that particular mobile home?

14     A.    I might have seen him once or twice, but that's it.

15     Q.    Okay.

16          MR. LEDDIN:  Thank you.  I have no further questions.

17          THE COURT:  Anything else, Ms. Zaehringer?

18          MS. ZAEHRINGER:  Your Honor, did I move to admit

19  Government's Exhibits 6 and 7?  If I didn't, I would like to do

20  that at this time.

21          THE COURT:  You did.

22          MS. ZAEHRINGER:  Thank you.

23          THE COURT:  Thank you, ma'am.  You are excused.  Call

24  your next witness.

25          MS. ZAEHRINGER:  United States calls Miranda Lalla.

1          THE COURT:  I forgot to tell you.  One of the jurors

2     approached me this morning and asked me how you spell proffer

3     and then asked what it is and I just simply told her I'd inform

4     you guys that a juror asked about what a proffer is.  Somewhere

5     in the course of the trial you can make that better known if you

6     want.

7                          MIRANDA LALLA-HOUSER,

8     witness herein, called as a witness by the government, after

9     having been first duly sworn, was examined and testified as

10    follows:

11         THE COURT:  When you are comfortably seated there,

12    ma'am, would you pull that microphone closer to your mouth, get

13    closer to the microphone, you have to get pretty close to it and

14    tell us your name and spell your last name.

15         THE WITNESS:  Miranda Lalla-Houser, M-i-r-a-n-d-a,

16    L-a-l-l-a.

17         THE COURT:  Even a little closer than that.  You can

18    bend the microphone and pull it closer.  Go ahead.

19         THE WITNESS:  Houser, H-o-u-s-e-r.

20         THE COURT:  Thank you.

21                          EXAMINATION

22    BY MS. ZAEHRINGER:

23    Q.   Can you tell us how old you are?

24    A.   47.

25    Q.   Are you currently employed?

1     A.   Yes.

2     Q.   Where do you work?

3     A.   Burger King.

4     Q.   And how long have you been employed there?

5     A.   About three months.

6     Q.   And are you currently on probation?

7     A.   Yes.

8     Q.   What are you on probation for?

9     A.   Theft third -- a theft charge.

10    Q.   Is that a felony charge?

11    A.   Yes.

12    Q.   And what year did that take place?

13    A.   '06 I think.

14    Q.   Are you in the drug program right now?

15    A.   Yes, I am.

16    Q.   Through Johnson County?

17    A.   Yes.

18    Q.   And do you have a prior delivery of drugs back in

19 2000?

20    A.   Yes, I do.

21    Q.   Other than that do you have any other criminal history

22 felonies?

23    A.   No.

24    Q.   You have been subpoenaed here today to give

25 information regarding the defendant, Ricardo Townsend, is that

1  correct?

2      A.   Yes.

3      Q.   And we have talked before in the past about the

4  testimony and the information that I would be asking you?

5      A.   Yes.

6      Q.   During our talks were you given any promises from the

7  government or from law enforcement agents regarding your

8  testimony?

9      A.   No.

10      Q.   Can you tell us whether you were using crack?

11      A.   Yes.

12      Q.   When did you start using crack?

13      A.   In '99.

14      Q.   How often were you using?

15      A.   As much as I could.

16      Q.   When did you cease using crack?

17      A.   I've tried off and on to quit.

18      Q.   When is the last time -- did you recently relapse?

19      A.   I relapsed October 1st.

20      Q.   So when is your last clean date?

21      A.   October 4th.

22      Q.   During the time that you were using crack did you have

23  primary sources that you went to?

24      A.   Yes.

25      Q.   Back in 2005 did you have a primary source that you

1  went to in the Iowa City area?

2       A.    Yes.

3       Q.    After that source left the area did you find another

4  source?

5       A.    Yes.

6       Q.    And who did you begin getting drugs from at that

7  point?

8       A.    I know him as Freaky.

9       Q.    How did you get introduced to Freaky?

10      A.    Through another friend.

11      Q.    And what is that person's name?

12      A.    Jody, Chris, I don't know his last name, all I know

13 him as Jody or Chris.

14      Q.    That is one person, Jody -- you either call him Jody

15 or Chris?  Is that yes?

16      A.    Yes.

17      Q.    And you don't know his last name?

18      A.    No.

19      Q.    How did it come about that Chris introduced you to

20 Freaky?

21      A.    When I kept calling him looking for something.

22      Q.    You kept calling Chris looking for something?

23      A.    Yeah.

24      Q.    And then Chris introduced you -- did -- was there a

25 face-to-face meeting or did he give you the phone number?

1     A.   No, he didn't give me the number.  He -- I went

2   through him a couple of times and then I met Freaky myself and I

3   don't remember exactly how that meeting was.

4     Q.   How often were you buying from Freaky?

5     A.   Oh, as much as I could get it.

6     Q.   Can you tell me in an average week how much you would

7   spend on crack?

8     A.   I don't remember, but it was a lot.

9     Q.   Were you using every day?

10     A.   Yes.

11     Q.   What quantity were you using every day?

12     A.   Well, whatever amount I could get for the day.

13     Q.   What is the least amount you would use in a day?

14     A.   Oh, probably maybe 50 or 100.

15     Q.   When you say 50 or 100, you mean dollars worth?

16     A.   Yes.

17     Q.   So you're buying at least $50 a day of crack from the

18   defendant?

19     A.   Sometimes, yeah.

20     Q.   How would you get ahold of the defendant to order

21   crack?

22     A.   Call.

23     Q.   You had his cell phone number?

24     A.   Yeah.

25     Q.   When you called him did he always have crack?

1     A.   No.

2     Q.   When you called him to order did he deliver the crack?

3     A.   Yes.

4     Q.   What locations did the transactions take place?

5     A.   Coralville, Iowa City, exactly where they were, I

6 don't remember; but --

7     Q.   Did you ever meet the defendant in North Liberty?

8     A.   Yes.

9     Q.   In what location in North Liberty?

10     A.   There's a strip mall right on 965.  I met there and at

11 Scotty Schalla's place a couple times.

12     Q.   Where does he live?

13     A.   Holiday Lodge.

14     Q.   In the trailer park there?

15     A.   Yes.

16     Q.   Did you ever meet at any other trailer besides

17 Scotty's trailer?

18     A.   No.

19     Q.   Can you describe where the strip mall is that you are

20 talking about in reference to the trailer park?

21     A.   It's right across the highway.

22     Q.   Did the defendant have anybody else deliver drugs for

23 him to you?

24     A.   No.

25     Q.   Did you know where the defendant lived?

1      A.    No.

2      Q.    Is there times when you would pool your money with

3  other friends or customers to get a larger quantity of crack

4  from the defendant?

5      A.    Sometimes, yes.

6      Q.    And what would be the purpose of you getting for

7  others, what benefit --

8      A.    To supply myself.

9      Q.    How often were you brokering deals?

10     A.    As much as I could.

11     Q.    Did you introduce the defendant to anyone else?

12     A.    I had introduced him to Scotty.

13     Q.    Is that Scott Schalla?

14     A.    Yes.

15     Q.    When did that introduction take place, if you

16 remember?

17     A.    I don't remember the date, but it was not too long

18 after I had met Freaky.

19     Q.    And you had met Freaky about what time frame?

20     A.    It was in I think '06.

21     Q.    Can you say whether it was in the beginning of '06,

22 middle of '06, late '06?

23     A.    I don't remember.

24     Q.    Is there a time frame when you went to jail in '06?

25     A.    Yes.

1    Q.   Can you recall when that occasion occurred?

2    A.   I went from the -- around January until April,

3  somewhere around there.

4    Q.   So were you dealing with Freaky before that time?

5    A.   Yes, it was before that time so it was actually

6  probably in late '05.

7    Q.   After you got out in April did you continue to deal --

8  did you go back dealing with Freaky?

9    A.   I might have a couple of times, but not much.

10    Q.   So on the -- in '05 it was more regular than it was in

11  April of '06?

12    A.   Yes.

13    Q.   Do you know an individual by the name of Kung Fu or

14  William Branch?

15    A.   Yes.

16    Q.   And how do you know him?

17    A.   I've known him for like 11 years.

18    Q.   Where was he residing during this time period?

19    A.   He resided in Lakeside Apartments.

20    Q.   Do you know whether the defendant was dealing with

21  Kung Fu?

22    A.   I didn't know if they dealt together for sure, but I

23  knew they knew each other.

24    Q.   Did you have occasion to be at Kung Fu's house when

25  the defendant was also there?

1      A.    No, I don't remember.

2      Q.    Do you know whether the defendant dealt with a person

3  by the name of Cecelia Nosa or CC?

4      A.    I don't know if they dealt together or not or --

5      Q.    Do you know whether they knew each other?

6      A.    No, I'm not sure if I do.

7      Q.    Do you see Freaky in the courtroom here today?

8      A.    Yes, I do.

9      Q.    Can you tell me where he is seated and what he is

10  wearing?

11      A.    He's wearing a beige or tan colored top and he is

12  seated to the right of me facing me.

13          MS. ZAEHRINGER:  Let the record reflect she has

14  identified the defendant.  I have no further questions.

15          THE COURT:  Mr. Leddin?

16          MR. LEDDIN:  Thank you, Your Honor.

17                          EXAMINATION

18  BY MR. LEDDIN:

19      Q.    Ms. Lalla-Houser, you are currently in drug court in

20  Johnson County, Iowa?

21      A.    Yes.

22      Q.    If you could please describe for the jury what drug

23  court is.

24      A.    Drug court is the last result before you go to prison,

25  it's a last chance to see if you can change your life.

1      Q.   Would it be fair to say that drug court is an

2  alternative to incarceration that is available to defendants

3  that have a drug problem?

4      A.   Yes.

5      Q.   And when were you placed into drug court?

6      A.   In I think April of -- April of last year.  I'm trying

7  to think.

8      Q.   And what charge were you convicted of that led you

9  into drug court?

10     A.   My theft charge.

11     Q.   That -- was that theft in the second degree?

12     A.   I'm not sure exactly what degree it was, but it was a

13  theft charge.

14     Q.   It is fair to say though that that is a felony theft

15  charge?

16     A.   Yes.

17     Q.   And that with that charge you were looking at a

18  maximum term of about five years of incarceration?

19     A.   Yes.

20     Q.   And is a condition of being in drug court cooperating

21  with the government here today?

22     A.   No.

23     Q.   Well, what benefit are you receiving from the

24  government for testifying today?

25     A.   I'm not.  I'm doing the right thing.

1    Q.   Well, what -- most people that testify in drug cases

2  like this for the government have been involved in some type of

3  drug dealings or transactions.  What were you involved in?

4    A.   What do you mean by that?

5    Q.   Well, essentially isn't it true that you were selling

6  crack cocaine in Johnson County from 2005 to 2007?

7    A.   You could say that I was moving some, yeah.

8    Q.   Okay.

9    A.   I was using it too.  I didn't just sell it, I was

10  doing it too to use it.

11    Q.   And that you had an interview with Agent Blomgren?

12    A.   Yes.

13    Q.   And in that interview you told him that you were

14  selling some crack cocaine?

15    A.   Yes.

16    Q.   And that you said that two of your customers were

17  Scott Schalla and Rocky Mather?

18    A.   Yes.

19    Q.   And so did Agent Blomgren charge you with conspiracy

20  to distribute crack cocaine?

21    A.   No.

22    Q.   Did he charge you with possession of crack cocaine

23  with intent to deliver?

24    A.   No.

25    Q.   Isn't it true that you struck a deal with Agent

1  Blomgren where you would testify in exchange for these charges

2  not being filed against you?

3      A.   No.

4      Q.   So you're telling the jury here today that you're

5  testifying today out of the goodness of your heart and without

6  any benefit whatsoever?

7      A.   Yes.  I'm in the program Today of Recovery and today

8  it is about changing your life and being accountable for my past

9  plus being honest with myself.

10     Q.   Well, aren't you afraid that the government could

11 charge you with a conspiracy or a possession with intent to

12 deliver offense based on the statements you made?

13     A.   Yes.

14     Q.   And isn't it true that that is motivating you to

15 cooperate with the government?

16     A.   No, I wouldn't say that.

17     Q.   You wouldn't say that, so you don't fear being in

18 prison for at least five years?

19     A.   Yeah, I'm in fear of being in prison, yeah.

20     Q.   And have you testified for the government in any type

21 of trial or hearing before today?

22     A.   No.

23     Q.   Have you given -- have you talked to Agent Blomgren or

24 any other government officials or police officers about any

25 other drug activity or names or people or any other type of

1 criminal activity?

2     A.    Have I before?

3     Q.    Yes.

4     A.    Yeah.

5     Q.    Okay.  And have you talked with the police or agents

6 on a number of different occasions?

7     A.    Yeah.

8     Q.    So it is fair to say that you are working with the

9 government?

10     A.    No.  Just because you talk to somebody doesn't mean

11 you're working with them.  I talk in the program about the

12 things that I have done in the past.  That doesn't mean I'm

13 working in the program.

14     Q.    Is Agent Blomgren, is he a part of this program?

15     A.    No, he's a police officer as far as I'm concerned.

16 I'm talking about the recovery program.

17     Q.    So it is fair to say though that you were talking to

18 police officers and federal agents and working with them outside

19 of your program?

20     A.    No.

21     Q.    You're not talking to any police officers?

22     A.    Well, I have spoke to police officers in my past, yes.

23     Q.    It's fair to say that you have a long criminal record?

24     A.    Yes.

25     Q.    Okay.  And that you have been convicted of four prior

1 drug offenses?

2     A.    Been convicted?  What do you mean?

3     Q.    Either you pled guilty to or you were found guilty by

4 a judge or a jury of four different drug offenses?

5     A.    I have the felony charge, I don't know if those -- the

6 other charges are paraphernalia charges or what they are.

7     Q.    Well, on July 21st of 1999 weren't you convicted of

8 possession of a controlled substance in Johnson County, Iowa?

9     A.    That was a charge that -- that I have the felony on I

10 think.

11     Q.    Well, isn't that actually a serious misdemeanor, that

12 is possession of marijuana?

13     A.    It could be, yeah.

14     Q.    And then in -- isn't it true that on October 29th of

15 1999 you were again convicted of possession of controlled

16 substance, but this time cocaine, in Johnson County, Iowa?

17     A.    Yeah.

18     Q.    And that you were sentenced to serve 15 days in jail

19 for that offense?

20     A.    Yes.

21     Q.    Okay.  And on May 26th of 2000 isn't it true that you

22 were also convicted of possession of controlled substance, crack

23 cocaine, in Johnson County?

24     A.    Yes.

25     Q.    And that you were sentenced to serve 365 days at the

1  residential correctional facility?

2       A.   Yes, I was.

3       Q.   And that on May -- also again on May 26th you were

4  convicted of possession of controlled substance third offense?

5       A.   Yes.

6       Q.   And then you already talked about your conviction for

7  a theft in the second degree, the felony, and have you also been

8  convicted of both operating while intoxicated and driving while

9  barred in Johnson County?

10      A.   Yes.

11           MR. LEDDIN:  Thank you.  I have no further questions.

12           THE COURT:  Ms. Zaehringer, anything else?

13           MS. ZAEHRINGER:  No, Your Honor.

14           THE COURT:  Thank you, ma'am.  You are excused.  Call

15  your next witness.

16           MS. ZAEHRINGER:  United States calls William Scott

17  Schalla.

18                     WILLIAM SCOTT SCHALLA,

19  witness herein, called as a witness by the government, after

20  having been first duly sworn, was examined and testified as

21  follows:

22           THE COURT:  Tell us your name and spell your last

23  name.

24           THE WITNESS:  William Scott Schalla, S-c-h-a-l-l-a.

25           THE COURT:  Go ahead, Ms. Zaehringer.

EXAMINATION

BY MS. ZAEHRINGER:

Q.   Can you tell us how old you are?

A.   44 years old.

Q.   And what city do you live in?

A.   North Liberty, Iowa.

Q.   How long have you lived there?

A.   Approximately 40 -- excuse me.  Since 19 -- excuse me.
Since 2002.

Q.   And are you currently working?

A.   Currently, no.

Q.   What type of work do you do?

A.   I'm an operating engineer with Local 234.  I operate
heavy equipment.

Q.   You have been subpoenaed here to testify in the case
regarding Ricardo Townsend, is that correct?

A.   Yes.

Q.   Have you been given any promises from the government
or from federal agents or local law enforcement agents regarding
your testimony here today?

A.   No, I haven't.

Q.   In the past have you worked as a confidential
informant?

A.   No.

Q.   You haven't worked as a confidential informant with

1 the --

2     A.   Oh, yes, I'm sorry, I have.

3     Q.   With the Iowa City Police Department?

4     A.   Yes.

5     Q.   And that wasn't in reference to this particular case,

6 was it?

7     A.   No, it wasn't.

8     Q.   During your work you were paid for the services?

9     A.   Yes.

10     Q.   And did you do everything that you were asked to by

11 the law enforcement agents?

12     A.   Yes.

13     Q.   Let's talk about your criminal history.  You have some

14 felonies?

15     A.   Yes, I've had a few felonies.

16     Q.   In 1996 you have a felony assault causing injury?

17     A.   Yes.

18     Q.   False imprisonment?

19     A.   Yes.

20     Q.   In '99 you have a fraud?

21     A.   Yes.

22     Q.   2000 fraud?

23     A.   Yes.

24     Q.   2003 burglary?

25     A.   Yes.

1       Q.   And you have a pending theft charge?

2       A.   Yes, I do.

3       Q.   That has not resulted in a conviction at this point?

4       A.   No, it hasn't.

5       Q.   Let's talk about your use history.  You were a crack

6  user?

7       A.   Yes, I was.

8       Q.   When did you first start using crack?

9       A.   In 2002.

10      Q.   How often were you using crack?

11      A.   A few times a week.

12      Q.   And did that continue until when?

13      A.   Up until February of last year.

14      Q.   February of 2008?

15      A.   Yes, ma'am.

16      Q.   And did your use continue at the two days a week from

17  2006 until 2008?

18      A.   Approximately there, yes.

19      Q.   Do you know the defendant in this case, Ricardo

20  Townsend?

21      A.   Yes, I do.

22      Q.   What name do you know him by?

23      A.   Rico.

24      Q.   Do you know him by any other name?

25      A.   No, I do not.

1    Q.   How did you meet him?

2    A.   I met him through a mutual acquaintance.

3    Q.   And what is this person's name?

4    A.   Miranda Lalla.

5    Q.   When did you meet Ricardo?

6    A.   It was in or around -- I want to say spring, but I

7    think it was a little earlier than that, of 2006.

8    Q.   How did it come about that you met him?

9    A.   I met him -- Miranda and he and I were all at my

10   residence in North Liberty exchanging a TV in between our

11   vehicles, our pickup trucks.

12   Q.   Who was buying the TV and who was selling the TV?

13   A.   I'm a little fuzzy on that.  I can't remember if it

14   was Miranda's or whether it was Ricardo's.

15   Q.   It wasn't your TV?

16   A.   No, it wasn't my TV.

17   Q.   Were you just helping transport the TV?

18   A.   Yeah, I was just a little bit of muscle at the time.

19   Q.   Okay.  After that initial encounter did you start

20   purchasing crack from the defendant?

21   A.   Yes, I did.

22   Q.   On that initial encounter did you obtain any crack

23   from the defendant?

24   A.   No, not on that initial time.  It was after that.

25   Q.   And how did you get ahold of the defendant to purchase

1   crack?

2        A.   I would make a phone call to him.

3        Q.   When you called him to place an order, where would

4   these transactions take place?

5        A.   Somewhere in or around North Liberty.

6        Q.   Did the transactions occur at your residence?

7        A.   A time or two.

8        Q.   And where did you reside?

9        A.   262 Holiday Lodge Road.

10       Q.   And that is part of the Holiday Mobile Home Park?

11       A.   Yes, it is.

12       Q.   Do you know where the defendant was staying?

13       A.   No, I don't.  I believe he had a residence in North

14   Liberty.

15       Q.   You had never been there?

16       A.   No.

17       Q.   How long did you deal with the defendant?

18       A.   Up until August or September of 2006.  I had taken off

19   on -- in September and gone down to Missouri for work.

20       Q.   So your last contact with the defendant was in August

21   of '06?

22       A.   August or September, yes, ma'am.

23       Q.   When you would purchase crack from the defendant, what

24   quantities were you getting?

25       A.   A gram.

1    Q.    What is the most you obtained from the defendant?

2    A.    At one time?

3    Q.    At one time.

4    A.    Probably a gram and a half or two grams.

5    Q.    Is there times when you would pool your money or

6    broker deals for other people?

7    A.    I'm sorry?

8    Q.    Is there times when you would pool your money with

9    other people to buy crack from the defendant?

10    A.    No.  It was basically for my own use.

11    Q.    Did you ever obtain any drugs and give it or sell it

12    to another individual?

13    A.    No.

14    Q.    When you would call the defendant to order drugs, was

15    there anybody else that would deliver on the defendant's behalf?

16    A.    At one time I met with a female friend of his.

17    Q.    Do you recall her name?

18    A.    No, I do not.

19    Q.    And where did that transaction take place?

20    A.    At Casey's in North Liberty.

21    Q.    And where is Casey's located in reference to the

22    trailer park that you resided in?

23    A.    About two -- about a block or two blocks north of the

24    trailer court.

25    Q.    Did anyone else make deliveries on behalf of the

1  defendant?

2      A.   Not that I'm aware of.

3      Q.   Did you ever go to trailer number 13 at the mobile

4  home park?

5      A.   Yes, I did.

6      Q.   And what was the purpose in going to that trailer?

7      A.   To purchase crack cocaine.

8      Q.   When you went to the trailer to purchase crack

9  cocaine, had you set up the deal through the defendant?

10     A.   Possibly at -- yes, a time or two.

11     Q.   Is there times when you just went to the trailer to

12 obtain crack?

13     A.   Yes.

14     Q.   Without calling the defendant first?

15     A.   Yes.

16     Q.   Who resided at the trailer?

17     A.   A fellow by the name of CB and Jock.

18     Q.   Anybody else reside there?

19     A.   Not that I know of any names.

20     Q.   Do you know whether CB and Jock were associated with

21 the defendant?

22     A.   Associated, I believe that they were.

23     Q.   Do you know where the defendant was getting his crack

24 from?

25     A.   No, I do not.

1     Q.   Do you know where the defendant had grown up?   Did

2  you have conversations with him about that?

3     A.   No.

4     Q.   Do you know Mark Riley?

5     A.   Yes, I do.

6     Q.   How do you know him?

7     A.   He's one of my good friends.

8     Q.   Did he live in the trailer park as well?

9     A.   Yes.

10    Q.   Where did he reside?

11    A.   Trailer 14.

12    Q.   And where is that in reference to trailer 13?

13    A.   Right next door.

14    Q.   Do you know whether Mark Riley knew the defendant?

15    A.   I believe he did.

16    Q.   Did you introduce Mark to the defendant?

17    A.   I can't recall whether I did or not.

18    Q.   Showing you what's been marked as Government's Exhibit

19  20A, do you recognize that?

20    A.   Yes, I do.

21    Q.   What do you recognize that to be?

22    A.   The trailer where a lot of people had gone.

23    Q.   Do you know who owned that trailer?

24    A.   I don't know who owned it.  I believe Allie

25  Alberhasky.

1      Q.   Who is Allie Alberhasky?

2      A.   The owner of the trailer court.

3      Q.   Did she reside there?

4      A.   No, she used to have a place over in Iowa City.

5      Q.   Do you see Ricardo in the courtroom here today?

6      A.   Yes, I do.

7      Q.   Can you tell me where he is seated and what he is

8   wearing?

9      A.   He's to your back left side wearing a khaki colored

10  shirt.

11         MS. ZAEHRINGER:  Let the record reflect the witness

12  has identified the defendant.  May I have just one second,

13  please?

14         (An off-the-record discussion was held.)

15         MS. ZAEHRINGER:  I have no further questions.

16         THE COURT:  Mr. Leddin?

17         MR. LEDDIN:  Thank you, Your Honor.

18                        EXAMINATION

19  BY MR. LEDDIN:

20     Q.   Mr. Schalla --

21     A.   Yes, sir.

22     Q.   -- you testified that individuals that go by CB and

23  Jock resided at this trailer at 13 Holiday Court?

24     A.   Yes, sir.

25     Q.   Isn't it true that you have no real evidence or

1  anything that these individuals were at all associated or even

2  knew Mr. Townsend?

3      A.   I have no evidence, no.

4      Q.   When did you first start working for or with the

5  government?

6      A.   Last February.

7      Q.   So it would have been February of 2008?

8      A.   Yes.

9      Q.   Okay.  And what caused you to start working with the

10 government?

11     A.   I ran into the Drug Task Force.

12     Q.   What do you mean you ran into the Drug Task Force?

13     A.   I was at a residence in Coralville and the Drug Task

14 Force happened to come in.

15     Q.   What was going on at this residence?

16     A.   There was -- the lady who owned the apartment had just

17 received an amount of crack cocaine.

18     Q.   And who was that lady?

19          MS. ZAEHRINGER:  Judge, I am going to object.  I just

20 think for security reasons this shouldn't be mentioned.

21          THE COURT:  Why do you need to know the identity?

22          MR. LEDDIN:  Your Honor, I was just -- it goes to

23 credibility of the witness and his entire testimony for

24 credibility purposes.

25          THE COURT:  I am going to sustain the objection.  You

1  can talk about the event, but not identify the other occupants

2  unless they have something to do with the people associated with

3  this case.

4          MR. LEDDIN:  Okay, Your Honor.

5      Q.   So these individuals -- a drug transaction had just

6  occurred at this residence that you were at?

7      A.   Yes, I believe so.

8      Q.   Okay.  And you were one of the people while this drug

9  -- involved in this drug transaction occurred?

10     A.   No, I was not there while the drug transaction

11  occurred.

12     Q.   At what point did you get there?

13     A.   Approximately an hour later.

14     Q.   And what type of drugs and how much are we talking

15  about?

16     A.   I couldn't tell you.  The officers did not state what

17  -- how much was there.

18     Q.   Were you using drugs at this residence?

19     A.   No.

20     Q.   So essentially you ran into the Drug Task Force, they

21  raided this residence?

22     A.   Yes.

23     Q.   Okay.  And did they pressure you to start working with

24  them?

25     A.   No, they did not pressure me.

1    Q.    So you started just working with the government out of

2    the goodness of your heart?

3    A.    I did for one event.

4    Q.    Okay.  You said that your drug of choice was crack

5    cocaine?

6    A.    Yes, sir.

7    Q.    Have you previously testified for the government

8    before today?

9    A.    Yes, I have.

10    Q.    How many times?

11    A.    Three.

12    Q.    So this would be the fourth time?

13    A.    Yes, sir.

14    Q.    And you were previously paid money for working with

15    the government?

16    A.    Yes.

17    Q.    Were you paid money to testify for the government?

18    A.    Through the federal government, yes.

19    Q.    So you're a paid witness?

20    A.    Yes.

21    Q.    Okay.  Are you being paid to testify today?

22    A.    Yes, I am.

23    Q.    How much are you being paid?

24    A.    I'm not sure what the amount will be.

25    Q.    How much were you paid for your previous testimonies?

1    A.    $139.

2    Q.    For each testimony?

3    A.    Yes.

4    Q.    You expect to receive the same amount today or more?

5    A.    It should be the same amount I would assume.

6    Q.    You said that you are currently not employed?

7    A.    No.

8    Q.    So essentially your job is essentially working for the

9    government?

10    A.    No, it's actually unemployment is what -- what I

11    actually consider collecting right now until my season starts up

12    around March 15th.

13    Q.    Do you have any plans to testify for the government in

14    the future?

15    A.    If they subpoena me, yes.

16    Q.    And you expect to be paid for your testimony?

17    A.    If they so wish.

18    Q.    Is it fair to say that you have a long criminal

19    record?

20    A.    Yes, it is.

21    Q.    And that on April 17th of 1998 you were convicted of

22    assault causing injury, assault with intent to commit serious

23    injury, and false imprisonment in Johnson County, Iowa?

24    A.    Yes.

25    Q.    Who were your victims?

1          MS. ZAEHRINGER:  Judge, I am going to object.

2          THE COURT:  Sustained.

3     BY MR. LEDDIN:

4          Q.   How old were your victims?

5          MS. ZAEHRINGER:  I am going to object.

6          THE COURT:  Sustained.

7     BY MR. LEDDIN:

8          Q.   You were sentenced to serve 120 days in jail for those

9     events, is that correct?

10         A.   No.

11         Q.   I'm sorry.  You actually received probation for those

12    charges, but at some point though your probation was revoked, is

13    that correct?

14         A.   Yes, it is.

15         Q.   And then you ended up serving -- ordered to serve 268

16    days in jail?

17         A.   In prison.

18         Q.   And then on June 3rd of 1998 you were convicted of a

19    theft in Johnson County?

20         A.   I don't recall that.

21         Q.   But if it states here on your criminal record that you

22    were convicted on June 3rd of '98 of theft in the fourth degree

23    in Johnson County, you have no reason to disagree with that?

24         A.   I have no reason to disagree with it, no.

25         Q.   And that on July 7th of 2000 you were convicted of

1    fraudulent practices which is a felony, sexual abuse, assault

2    causing injury, and false imprisonment in Johnson County?

3        A.    Sexual abuse?

4        Q.    Yes.

5        A.    No.  There is no sexual abuse on my record.

6        Q.    Well, can you explain why those charges are on your

7    criminal record?

8        A.    No, I can't, but I will sure be getting down to the

9    courthouse as soon as I get back to Johnson County.

10       Q.    And that on February 11th of 2003 you were convicted

11   of domestic assault with injury in Johnson County?

12       A.    Yes.

13       Q.    And that on November 5th of 2004 you were convicted of

14   two counts of burglary in the third degree in Linn County?

15       A.    There was one count is what it came out to be.

16       Q.    You were charged with two and you pled to one?

17       A.    I believe so, yes.

18       Q.    Okay.  And that you were sentenced to serve five years

19   in prison?

20       A.    Five years in prison, yes.

21       Q.    And that on September 29th of 2008 you were arrested

22   in Johnson County for theft second which is a felony?

23       A.    Yes.

24       Q.    And you previously testified that that charge is still

25   pending?

1    A.    Yes.

2    Q.    Why is it still -- why is it still pending?  Why is it

3    taking so long to reach a resolution?

4        MS. ZAEHRINGER:  Judge, I am going to object.

5        THE COURT:  I would like to see the lawyers outside

6    the hearing of the jury with the court reporter, please.  This

7    will just take a minute.

8        (Outside the presence of the jury.)

9        THE COURT:  What is your objection?

10       MS. ZAEHRINGER:  He wants to talk about his pending

11   theft charge.

12       THE COURT:  But the extent to which it is being

13   delayed, for example to see what he does here or his

14   cooperation, that's fair game.

15       MS. ZAEHRINGER:  Right.  That's not the case.

16       MR. LEDDIN:  That is the case.

17       THE COURT:  What do you contend is the truth?

18       MS. ZAEHRINGER:  Because he's taking it to trial and

19   so I just don't want him to talk about the facts of that case.

20   I don't want it to have any bearing on his case there or talk

21   about the facts.

22       THE COURT:  He has a Fifth Amendment privilege and the

23   fact that it is still pending, you can question him about it and

24   understand that if he claims that he's taking it to trial, then

25   he's going to have the privilege.  Getting him to testify about

1  the facts would not be appropriate; but anything to do with his

2  motivation for being here is fair game.

3            MR. LEDDIN:  Exactly, Judge.

4            MS. ZAEHRINGER:  Judge, at this point I would like to

5  make a Motion in Limine as far as the convictions of the other

6  witnesses coming up.  The defendants' convictions are just

7  domestic assault misdemeanors.  The only thing that are

8  admissible are the felonies and the crimes of dishonesty which

9  would be thefts.

10           THE COURT:  We can talk about that in the context of

11  other witnesses; but misdemeanors that do not go to someone's

12  truth and veracity are not admissible for impeachment purposes.

13  Felonies over 10 years old, when they have been released from

14  prison more than 10 years ago, are also not admissible.  We

15  could talk about any of them in the context of a particular

16  conviction, and I have a lot of discretion in that regard; but

17  in general like this domestic abuse assault is not an

18  impeachable conviction.

19           MR. LEDDIN:  I would ask with the exception of

20  possession of drugs or drug paraphernalia that is central to

21  this case, that goes to relevance, correct?

22           THE COURT:  I will think about that.

23           MR. LEDDIN:  Thank you.  Okay.

24           THE COURT:  Thanks.

25           (In the presence of the jury.)

1        THE COURT:  The question that was pending to you

2   before we took a break was why is it still pending, why is it

3   taking so long to reach a resolution.

4        THE WITNESS:  I can't answer that.  That would be

5   something the Court would -- Johnson County would have to

6   answer.

7        THE COURT:  Thank you.  Go ahead.  Pose a new

8   question.

9        MR. LEDDIN:  Thank you, Your Honor.

10   Q.   Concerning the theft second case, isn't it true that

11   you are facing a maximum of five years in prison?

12   A.   Yes, it is.

13   Q.   And isn't it true that part of your cooperation with

14   the government concerning the possible outcome of this theft

15   second charge is testifying here today?

16   A.   No, it isn't.

17   Q.   Well, isn't it true that your cooperation and

18   willingness to work with the government here and in other cases

19   is going to affect what the government says in the theft second

20   case in Johnson County?

21   A.   I'm sure it's going to have some impact on it, yes.

22        MR. LEDDIN:  Thank you.  I have no further questions.

23        THE COURT:  Ms. Zaehringer?

24        MS. ZAEHRINGER:  Thank you.

25

FURTHER EXAMINATION

1  BY MS. ZAEHRINGER:

3      Q.    The defense attorney asked you whether you are working

4  with the government.  When you were working as a confidential

5  informant, that was through the Iowa City Police Department?

6      A.    Yes, it was.

7      Q.    That wasn't my office or the U.S. Attorney's Office or

8  myself?

9      A.    No, it was not.

10     Q.    You indicated that you were paid a witness fee for

11  being here today?

12     A.    Yes.

13     Q.    That -- you were a subpoenaed witness, is that

14  correct?

15     A.    Yes.

16     Q.    And when you got the subpoena did you get paperwork

17  with it describing what fees you would get for being here to

18  testify?

19     A.    I don't know if it was when I received -- I've got a

20  paperwork -- some paperwork that states what the fees are.  I

21  don't know if I received it when I got down here and talked to

22  Sue or whether it was in the mail with the subpoena.

23     Q.    So the witness fees aren't something that we talked

24  about and we negotiated what we were going to pay you, is that

25  right?

1    A.   No, no.

2    Q.   It is a standard fee that --

3    A.   Standard fee.

4    Q.   For everyone?

5    A.   Yes.

6    Q.   And you got more than the standard fee because you got

7  paid mileage, is that right?

8    A.   Correct.

9    Q.   And so the total mileage and the standard federal

10  witness fee came up in your case to $139?

11   A.   Yes.

12   Q.   You didn't get anything else besides that?

13   A.   No.

14   Q.   You knew that the defendant had contacts to that

15  trailer number 13, isn't that right?

16   A.   Yes.

17   Q.   You called the defendant a time or so and picked up

18  drugs at that trailer?

19   A.   Yes.

20   Q.   So you knew that he had people at that trailer?

21   A.   Yes.

22        MS. ZAEHRINGER:  I have no further questions.

23        THE COURT:  Mr. Leddin?

24        MR. LEDDIN:  No questions, Your Honor.

25        THE COURT:  Thank you.  You are excused.  Call your

1   next witness.

2          MS. ZAEHRINGER:  United States calls Mark Riley.

3                          MARK RILEY,

4   witness herein, called as a witness by the government, after

5   having been first duly sworn, was examined and testified as

6   follows:

7          THE COURT:  When you are comfortably seated there,

8   would you pull close to that microphone, you can bend it or

9   whatever so it is right in front of your mouth, tell us your

10  name and spell your last name.

11         THE WITNESS:  Mark Riley, R-i-l-e-y.

12         THE COURT:  Go ahead.

13                        EXAMINATION

14  BY MS. ZAEHRINGER:

15     Q.   Can you tell us how old you are?

16     A.   49.

17     Q.   And do you currently work?

18     A.   Yes.

19     Q.   Where do you work?

20     A.   Local 234.

21     Q.   And what do you do there?

22     A.   Run heavy equipment.

23     Q.   And what city do you live in?

24     A.   North Liberty, Iowa.

25     Q.   How long have you lived in the North liberty area?

1    A.    44 years.

2    Q.    Do you have any criminal history, any felonies on your

3    record?

4    A.    No.

5    Q.    Did you used to be a crack user?

6    A.    Yes.

7    Q.    How long did you use crack for?

8    A.    Off and on for 30 years probably.

9    Q.    And have you been clean?

10   A.    Yes.

11   Q.    For how long?

12   A.    A little over two years.

13   Q.    Do you know the defendant of this case, Ricardo

14   Townsend?

15   A.    Yes.

16   Q.    How do you know him?

17   A.    Friend.

18   Q.    When did you meet him?

19   A.    Couple years ago I think.

20   Q.    Who did you meet him through?

21   A.    Scott Schalla.

22   Q.    Do you recall that first meeting of where that took

23   place?

24   A.    At Scott's place.

25   Q.    And where does Scott reside?

1    A.    In Holiday Mobile Home.

2    Q.    Do you know what number he resides in?

3    A.    No, I don't know what number it is for sure.

4    Q.    Did you live at the Holiday Mobile Home Park?

5    A.    Yes.

6    Q.    When did you move there?

7    A.    '95 I think it was.

8    Q.    And what trailer do you live in or did you live in?

9    A.    I lived in two of them there, last one was at 14

10   Holiday.

11   Q.    When did you move to 14?

12   A.    2000.

13   Q.    And are you currently there?

14   A.    No.

15   Q.    When did you move out of 14?

16   A.    A year ago.

17   Q.    What was the purpose of you meeting the defendant at

18   Scott's house?

19   A.    Just to be there, I was just there.

20   Q.    Did you then have a relationship with the defendant?

21   A.    No.

22   Q.    Did you ever buy drugs from the defendant?

23   A.    Yes.

24   Q.    Did that start after you met him through Scott?

25   A.    Yes.

1    Q.    How often were you buying drugs from the defendant?

2    A.    Just here and there, not very often.

3    Q.    How many times a week?

4    A.    Once or twice.

5    Q.    And how long did you know the defendant?

6    A.    Couple years.

7    Q.    And -- I'm sorry?

8    A.    Somewhere in there.

9    Q.    And during that couple years did you continue to buy

10   from him one to two times a week?

11   A.    No, just every once in a while.

12   Q.    Approximately how many times do you think you bought

13   from the defendant over the entire time you knew him?

14   A.    Around 30 times probably.

15   Q.    What type of quantities were you buying from the

16   defendant?

17   A.    Fifties to 100.

18   Q.    When you say fifties, you mean $50 worth?

19   A.    Yes.

20   Q.    Do you know how much a $50 bag weighs?

21   A.    Half a gram.

22   Q.    Up to $100 bag which would be one gram?

23   A.    One gram, yes.

24   Q.    Is there any occasion when you bought more than one

25   gram from the defendant?

1     A.    I don't know, maybe once, twice.  I don't really

2   recall.

3     Q.    What is the largest quantity you bought from the

4   defendant?

5     A.    The most probably would have been 150.

6     Q.    Which would correspond to what weight?

7     A.    One and a half grams.

8     Q.    How would you get ahold of the defendant to order

9   crack from him?

10     A.    I'd call him.

11     Q.    When you called him would he always deliver it to you?

12     A.    No, we usually just met somewhere.

13     Q.    Where would you meet?

14     A.    Just on a back road.

15     Q.    In what city?

16     A.    In North Liberty.

17     Q.    Any particular back road in the -- are you talking

18   about in the trailer park or are you talking outside the trailer

19   park?

20     A.    Outside the trailer park.

21     Q.    Do you know whether the defendant owned a mobile home

22   in the trailer park?

23     A.    Yes.

24     Q.    What one did he own?

25     A.    The one right behind me.

1    Q.    And what number was that?

2    A.    I think it was 13.

3    Q.    Do you recall when he purchased that?

4    A.    No, not for sure.  All I know is he got it off my

5    cousin or was -- my nephew it would have been.

6    Q.    So the previous owner was your nephew?

7    A.    Yes.

8    Q.    And did your nephew put the trailer up for sale?

9    A.    Yes, he was looking for a buyer.

10   Q.    Did you put the defendant in contact with your nephew

11   in order to facilitate the deal?

12   A.    Yes.

13   Q.    When the defendant purchased the trailer do you recall

14   who moved in?

15   A.    No, I don't.

16   Q.    Did the defendant move in?

17   A.    No.

18   Q.    Who did you see residing or living at that trailer?

19   A.    Just some other people that I did not know.

20   Q.    Do you know any of them, any of their names that

21   resided there?

22   A.    All I know was one was called CB or something and one

23   was called Cuz, there was some other ones, but I didn't really

24   know their name.

25   Q.    Do you know where the defendant resided?

1    A.    No.  I figured in North Liberty.

2    Q.    Was there a time when you picked the defendant up at

3  an apartment complex or a duplex in North Liberty?

4    A.    It was an apartment.

5    Q.    And where was that located?

6    A.    Over by Central.

7    Q.    Can you describe what these -- what this complex

8  looked like?

9    A.    It was like an apartment complex, straight in a row.

10    Q.    Multiple levels, one level?

11    A.    Two levels.

12    Q.    Two levels for one apartment or --

13    A.    I think so, yes.

14    Q.    So one unit is two levels?

15    A.    Yeah.

16    Q.    Next to the next unit that's two levels?

17    A.    Yeah.

18    Q.    Why did you have occasion to go to that residence?

19    A.    There's times that I took him because he was getting

20  his vehicle worked on and I took him so he could pick it up.

21    Q.    Did you ever pick the defendant up and take him to the

22  trailer?

23    A.    No.

24    Q.    Do you know how long CB lived in the trailer?

25    A.    No, I don't.

1    Q.   Can you tell me whether there was one person living at

2   the trailer or numerous people living at the trailer?

3    A.   There was more than one there at times, yes.  How

4   many, I don't know.

5    Q.   Can you tell us whether there was a lot of foot

6   traffic at that trailer?

7    A.   Yeah, there was a lot of people came and gone.

8    Q.   When you say come and gone, would they stay for long

9   periods of time?

10    A.   There's times, yeah, there was, but nobody was there

11   usually over a week.

12    Q.   In June of 2007 do you recall that there was a search

13   warrant done at that trailer, trailer number 13?

14    A.   Yeah, I think so.  I don't know what the date was or

15   none of that, but --

16    Q.   During that time period who was living there?

17    A.   I don't know who was living there.   All I know there

18   was a guy named Cuz.

19    Q.   Did you have conversations with Cuz?

20    A.   He asked me to use my electricity once.

21    Q.   And what did you do?

22    A.   I let him use it.

23    Q.   And how did that work?

24    A.   I just -- they just used it to turn the lights on and

25   that and that was all that I know it was running off of; but I

1    told him a couple days it was on I was able to let him use it.

2         Q.    So your trailer is next door to 13?

3         A.    Yeah.

4         Q.    So how did the electricity get from 14 to 13?

5         A.    I had a plug-in in the back.

6         Q.    So there would be a cord going from 14 to 13?

7         A.    Yes.

8         Q.    And so there was no lights or electricity in 13 at

9    that time, they were using your electricity?

10        A.    Yes.

11        Q.    And the person that is using it, his name is Cuz?

12        A.    That's all I know him by.

13        Q.    Was there another individual there at that time?

14        A.    I'm not positive.

15        Q.    And do you see Ricardo in the courtroom here today?

16        A.    Yes.

17        Q.    Can you tell me where he is seated and what he is

18    wearing?

19        A.    Right back there, (Indicating) brown suit.

20               MS. ZAEHRINGER:  I have no further questions.

21               THE COURT:  Mr. Leddin?

22               MR. LEDDIN:  Thank you, Your Honor.

23                            EXAMINATION

24    BY MR. LEDDIN:

25        Q.    Mr. Riley, isn't it true that a woman by the name of

1    Shonna Stanley lived at the mobile home located at 13 Holiday

2    Court?

3         A.    Who?

4         Q.    Shonna Stanley, a woman.

5         A.    I'm not sure, no.

6         Q.    Well, isn't it true that you did see a woman at some

7    point living at that -- at that mobile home?

8         A.    No, not for sure, no.

9         Q.    It sounds like you are not really sure who was living

10   there.

11        A.    No, I don't.

12        Q.    Okay.  But isn't it true that Mr. Townsend was not

13   living there?

14        A.    Yes.

15        Q.    So -- that was a yes, right?

16        A.    Yes.

17        Q.    And isn't it true that Mr. Townsend was actually

18   living out of state?

19        A.    Yes.

20        Q.    And that a person that goes by Cuz asked to use your

21   electricity?

22        A.    Yes.

23        Q.    And I assume it is because there was no active working

24   power or electricity at the trailer at 13 Holiday Court?

25        A.    Yes.

1    MR. LEDDIN:  Thank you.  I have no further questions.

2    THE COURT:  Ms. Zaehringer, anything else?

3    MS. ZAEHRINGER:  Yes, Your Honor.

4                    FURTHER EXAMINATION

5    BY MS. ZAEHRINGER:

6    Q.    In direct examination did you say that you were buying

7    from the defendant two days a week?

8    A.    Couple times I have, yes.

9    Q.    Okay.  Was it on a consistent basis that you were

10   buying two days a week?

11   A.    No.

12   Q.    How often would you see the defendant?

13   A.    Just off and on here and there.

14   Q.    The residence located in North Liberty, do you know

15   who resided there at the -- what you call the two-story

16   apartments?

17   A.    No.  All I knew -- all I ever heard it was his

18   girlfriend or his wife.  I didn't know.

19   Q.    Do you know whether he had kids living there?

20   A.    No, I don't know.

21   Q.    So he would be there visiting his girlfriend or wife?

22   A.    Yes.

23   Q.    Do you know how often he would stay?

24   A.    No.

25   Q.    You don't know whether he lived there?

1     A.   No.

2         MS. ZAEHRINGER:  Thank you.

3         THE COURT:  Mr. Leddin, anything else?

4         MR. LEDDIN:  Yes, Your Honor.

5                 FURTHER EXAMINATION

6 BY MR. LEDDIN:

7     Q.   So, Mr. Riley, the best of your knowledge, Mr.

8 Townsend came to North Liberty to visit, correct?

9     A.   Yes.

10    Q.   And he came to North Liberty to visit his girlfriend

11 and his children?

12    A.   Yes, as far as I know.  I don't know about his

13 children.

14    Q.   And that his girlfriend was living somewhere in North

15 Liberty?

16    A.   As far as I knew, yes.

17    Q.   Mr. Riley, you testified that you were using crack

18 cocaine?

19    A.   Yes.

20    Q.   And that you have a conviction for possession of crack

21 cocaine?

22    A.   I have one pending, yes.

23    Q.   And where is that pending, sir?

24    A.   In Iowa City or North Liberty.

25    Q.   Would that be Johnson County?

1    A.   Yes.

2    Q.   And when were you -- what was the date that you were

3   arrested for that?

4    A.   I'm not positive.  It's been about a year ago.

5    Q.   So maybe sometime summer of 2008?

6    A.   Yes.

7    Q.   Have you -- isn't it true that you have made a deal

8   with the government to testify today in exchange for a lesser

9   sentence on that possession charge?

10   A.   No, not for positive.  They said something about that,

11  but that was all I've ever heard.

12   Q.   Who was the person that said something about that?

13   A.   Jerry.

14   Q.   Is that Agent Blomgren?

15   A.   Yes.

16   Q.   So you have talked to Agent Blomgren about this case?

17   A.   Yes.

18   Q.   And you have also talked to Agent Blomgren about your

19  pending possession of crack cocaine charge?

20   A.   Yes, lesser charge he said that he could work on

21  maybe.

22   Q.   And when he said work on it, does that mean he is

23  going to do something to potentially benefit you on that pending

24  charge if you testify here today?

25   A.   As far as I know, yes.  I'm not -- I was never

1   guaranteed nothing.

2       Q.   Sure.  Sure.  Does -- is it possible that by

3   testifying today that he could get that charge against you

4   dismissed?

5       A.   I'm sure he probably could.

6           MR. LEDDIN:  Great.  Thank you.  No further questions.

7           THE COURT:  Ms. Zaehringer?

8                    FURTHER EXAMINATION

9   BY MS. ZAEHRINGER:

10      Q.   When did you talk to Jerry about this deal?

11      A.   Shortly after I got arrested.

12      Q.   Prior to knowing that you were going to be testifying

13  here today?

14      A.   Yes.

15      Q.   So when you got the charge, you talked to Task Force

16  officers?

17      A.   Yes.

18      Q.   Did you agree to work with Task Force officers?

19      A.   Yes.  Well, it was just -- I was leaving town to go to

20  work out of town so they said that it was most likely I was

21  unable to help them.

22      Q.   So you didn't work with Task Force officers?

23      A.   No, not until he came and told me -- he served me

24  papers again.

25      Q.   He served you papers for this particular case?

1      A.   Yes, the second time.

2      Q.   So do you think you are going to get credit for not

3   working with the Task Force officers?

4      A.   I don't know.  I never had to talk to them again since

5   then.

6      Q.   You have been given no guarantees that you are getting

7   any credit for doing no work for the Task Force officers?

8      A.   Correct.

9           MS. ZAEHRINGER:  I have no further questions.

10           THE COURT:  Anything else, Mr. Leddin?

11           MR. LEDDIN:  No, Your Honor.

12           THE COURT:  Thank you, sir.  You are excused.  Call

13   your next witness.

14           MS. ZAEHRINGER:  United States calls Daniel Davis.

15                          DANIEL DAVIS,

16   witness herein, called as a witness by the government, after

17   having been first duly sworn, was examined and testified as

18   follows:

19           THE COURT:  When you are comfortably seated there, you

20   will have to get closer to that microphone if you would, please.

21           THE WITNESS:  May I have a glass of water?

22           THE COURT:  Certainly you may.  Tell us your name and

23   spell your last name.

24           THE WITNESS:  My full name is Daniel Morgan Davis,

25   last name is D-a-v-i-s.

1          THE COURT:  Go ahead.

2                         <u>EXAMINATION</u>

3     BY MS. ZAEHRINGER:

4          Q.    Can you tell us how old you are?

5          A.    I just turned 41 in January.

6          Q.    And where were you born?

7          A.    Johnson County.

8          Q.    Did you reside in Johnson County your entire life?

9          A.    No, ma'am.

10         Q.    Did you move around?

11         A.    Yes.

12         Q.    When did you move back to the Iowa City area?

13         A.    1998, right around there.

14         Q.    And can you tell us about your schooling background?

15    Do you have a high school diploma?

16         A.    Yes, I do.

17         Q.    Did you go to college?

18         A.    One year at the University of Iowa.

19         Q.    Did you quit college for what reason?

20         A.    Well, I had the idea that I was going to go to the

21    Writer's Workshop and after a year of school it just wasn't -- I

22    realized that I had the skills to write, but not the experience

23    and I wasn't going to get what I wanted at college.

24         Q.    Are you married?

25         A.    Yes, I am.

1    Q.   And how many kids do you have?

2    A.   I have two.

3    Q.   You are currently in federal custody?

4    A.   Yes.

5    Q.   On what charge?

6    A.   Right now I'm on a conspiracy, conspiracy for crack

7    cocaine and I believe four delivery charges.

8    Q.   Showing you what has been marked as Government's

9    Exhibit 4, do you recognize that?

10   A.   Yes, I do.

11   Q.   What do you recognize that to be?

12   A.   This is a Proffer Agreement between myself and the

13   United States Department of Justice.

14   Q.   And you were offered this Proffer Agreement in

15   reference to the case, the charges that you have pending?

16   A.   Yes.

17   Q.   You haven't currently pled to those charges, is that

18   correct?

19   A.   No, I have not.

20        MS. ZAEHRINGER:  Move to admit the Government's

21   Exhibit 4.

22        MR. LEDDIN:  No objection, Your Honor.

23        THE COURT:  Four is received.

24   BY MS. ZAEHRINGER:

25   Q.   In this Proffer Agreement, it is approximately four

1  pages long, what obligations do you have?

2      A.    Basically just full disclosure of any and all activity

3  involving the drug trade.

4      Q.    Basically cooperate with the government?

5      A.    Correct, and truthful information.

6      Q.    And what consequences would you suffer if you didn't

7  fulfill those obligations?

8      A.    The -- it is my understanding the contract would be

9  null and void and I would be subject to full penalties.

10     Q.    You haven't been offered a Cooperation Plea Agreement

11 at this time, is that correct?

12     A.    No, ma'am, I have not.

13     Q.    Is it your hopes that you will be offered a

14 Cooperation Plea Agreement?

15     A.    Yes.

16     Q.    And as part of the Cooperation Plea Agreement is it

17 also your hopes that you would cooperate and hopefully get a

18 reduction in your sentence?

19     A.    Yes, this is correct.

20     Q.    Have you been given any guarantees or any promises

21 from the government or any other federal agents?

22     A.    No, I have not.

23     Q.    Let's talk about your criminal history.  You have a

24 prior drug felony in 1999?

25     A.    Correct, and that -- other than that I have no other

1  criminal charges.

2       Q.   That was for heroin?

3       A.   Yes, it was.

4       Q.   Were you a drug user?

5       A.   Yes.

6       Q.   What drugs did you use?

7       A.   I've had a problem with heroin and powder cocaine and

8  crack cocaine.

9       Q.   And when did you begin using drugs?

10      A.   Probably around the age of 18, narcotics a little bit

11 later, 21, 22.

12      Q.   So you have had this consistent problem throughout

13 your life?

14      A.   Yeah, I've had periods where I've been able to abstain

15 or be clean for, you know, four years or so, you know, at a time

16 and it's something I've struggled with most of my adult life.

17      Q.   And you have been clean since when?

18      A.   April 21st of last year.

19      Q.   You indicated you moved to Iowa City in '98?

20      A.   Right, I returned to Iowa City in about 1998.

21      Q.   And when you returned here were you using heroin and

22 crack and powder?

23      A.   Yes, I'd come back from San Francisco, I had a good

24 handle on my habit and then I moved out to the West Coast, it

25 was in San Francisco, and ended up right back in the middle of

1    things again so when I came back I went on methadone maintenance

2    and was having some success with that, but it still --

3         Q.   Can you tell us what that means, the methadone

4    maintenance?

5         A.   Yeah, methadone is a substitute, it's legal, it's just

6    a liquid that you drink, it is dispensed by a doctor, there are

7    clinics, there's one in Cedar Rapids that I was going to.  You

8    take the medication in the morning and it staves off withdrawal,

9    it lasts for about 24 hours, and so it eliminates the need to

10   have to go and, you know, buy heroin and stuff to keep yourself

11   from getting sick.

12        Q.   So the methadone helps you get off of the heroin?

13        A.   Correct, and people use it to either taper offer of a

14   habit, they'll use it for, say, 21 days or else other people

15   have got, you know, a long history with it, go on maintenance

16   where they just take it every day and the idea with it is that

17   it is sort of like insulin to a diabetic.

18        Q.   And you attempted to do that after you moved back to

19   the Iowa City area?

20        A.   Correct.

21        Q.   Were you successful in always getting your methadone

22   and getting off heroin?

23        A.   Well, I've been on methadone a couple different times.

24   There have been times where it's worked really well for me,

25   there have been times when it hasn't.

1    Q.   After you moved back to the Iowa City area did you

2  have occasion to meet the defendant of this case?

3    A.   Yes, I did.

4    Q.   When did you meet him?

5    A.   Late July of '07.

6    Q.   How did it come about that you met the defendant?

7    A.   A woman that both of us knew called me up and said

8  that I should -- would maybe want to get in touch with him.

9    Q.   And what was this woman's name?

10   A.   Her name -- her street name is BayBay, her name I

11 believe is Irene Seals.

12   Q.   And how did you know BayBay?

13   A.   She sells heroin in the Iowa City area.

14   Q.   Why was it that BayBay was introducing you to the

15 defendant?

16   A.   Well, I think it was because that he had, you know,

17 some cocaine and some powder and some crack and she didn't --

18 doesn't really mess around with things like that and so, you

19 know, he was looking for customers.

20   Q.   Did BayBay sell to you?

21   A.   Heroin, yes.

22   Q.   She only supplied you with heroin?

23   A.   Correct.

24   Q.   After you met the defendant how did you get in contact

25 with him after that?

1    A.    You know, I don't recall whether she gave my number to

2  him or vice versa; but yeah.

3    Q.    Can you tell me about the first meeting?

4    A.    It was at the -- the Lowe's in the Lowe's parking lot

5  by the Coral Ridge Mall.

6    Q.    That is located where, in what city?

7    A.    Oh, in Coralville, Coralville, Iowa.

8    Q.    Who was -- was anybody with the defendant during that

9  transaction?

10    A.    I believe there was a woman with him.  I don't know

11  her name.

12    Q.    And what was that transaction for?

13    A.    Powder cocaine.

14    Q.    What quantity?

15    A.    Maybe $100 worth.

16    Q.    After that initial meeting did you -- did you continue

17  to purchase from the defendant?

18    A.    Yes, although, you know, we didn't -- it was only a

19  couple of months that I knew him.

20    Q.    When was the last transaction or when do you believe

21  you stopped dealing with the defendant?

22    A.    Probably September, maybe late September of 2007.

23    Q.    So during that couple month time period where would

24  the transactions take place between you and the defendant?

25    A.    A lot of times in parking lots, there was an occasion

1  where there was a hotel off the First Avenue exit in Iowa City,

2  it was there, and then there was a house that I met him at on --

3  on the east side of Iowa City off of Whispering Prairie which is

4  a street over by Lakeside Apartments.

5        Q.    Did you ever purchase drugs from the defendant at CC's

6  residence?

7        A.    Once.

8        Q.    And where is CC's residence located?

9        A.    At that time she was living -- there's a trailer park

10  and I can't remember the name of the trailer park, it's a ways

11  east of Iowa City, kind of a little ways out.

12        Q.    What quantities were you typically buying from the

13  defendant?

14        A.    Usually like $100 worth.

15        Q.    Of what substance?

16        A.    Most of the time powder cocaine, couple occasions

17  there was, you know, it was crack.

18        Q.    And what about heroin?

19        A.    Once, maybe twice.

20        Q.    And what quantity those couple times?

21        A.    Just a personal amount, you know, I never had a scale

22  so I couldn't say for sure; but it was just, you know, maybe a

23  dosage for, you know, to use maybe once.

24        Q.    Is there times when you would pool your money with

25  other customers to get a larger quantity?

1    A.    Yeah, there were -- once or twice with a gentleman

2  named Ben.

3    Q.    And what substance were you buying when you pooled

4  your money with Ben?

5    A.    Cocaine.

6    Q.    And do you know what Ben's last name is?

7    A.    Yeah, Boyd.

8    Q.    During the time that you were dealing with the

9  defendant were you working?

10    A.    Yes, I was, I was driving a taxicab.

11    Q.    Did this help facilitate the deals between you and the

12  defendant?

13    A.    There was once -- once when it did.

14    Q.    Can you tell us about that?

15    A.    Yeah, I had called him and he needed a ride so I

16  picked him up in a -- like a strip mall area off 965 and he

17  needed to go to a hotel.

18    Q.    So you picked him up in North Liberty at a strip mall?

19    A.    Correct, yes.

20    Q.    And took him where?

21    A.    To a hotel on First Avenue strip in Coralville.

22    Q.    What occurred there?

23    A.    He went and got a room and I purchased some crack from

24  him.

25    Q.    How did it come about that you purchased crack from

1  him on that occasion?

2      A.    Well, on that occasion -- it was the summertime and it

3  is very difficult to make money driving the cab and I was behind

4  on my child support and one of the sanctions that they can levee

5  on you if you are not current on your child support is they can

6  suspend your driver's license which would have in effect put me

7  out of work so I was really -- I was in a tight spot and I

8  didn't have a lot of money and I got him over to the hotel and I

9  really -- I don't recall exactly the amount, I had maybe $68,

10  $74, something like that, and he gave me a little extra that

11  day.

12      Q.    Can you describe the quantity, the size of the chunk

13  that you got?

14      A.    It was probably more than an eight ball I guess, you

15  know, but again, I never had a scale, you know, I wouldn't know.

16  It was more than I usually would be able to get.

17      Q.    And why did he give you the extra?

18          MR. LEDDIN:  Objection, Your Honor.  Speculation.

19          MS. ZAEHRINGER:  Let me ask another question.

20          THE COURT:  Thank you.

21  BY MS. ZAEHRINGER:

22      Q.    Did he tell you why he gave you the extra?

23      A.    Yeah, so I could -- to help me get the money together

24  for the child support.

25      Q.    Did you sell some of that crack that you had --

1    A.    That time I did, yes.

2    Q.    And who did you sell it to?

3    A.    Some of it to Ben, to Benjamin Boyd, and another guy I

4  believe named Mike Robinson.

5    Q.    During that transaction did you see this female again?

6    A.    No, no, I didn't.  He had needed -- he needed to meet

7  up with someone, but I didn't see who it was and -- yeah.

8    Q.    When you were giving him a ride to the hotel, did the

9  defendant tell you why he was needing to get to the hotel?

10   A.    I believe that it was, you know, there was maybe some

11  heat on in North Liberty.

12   Q.    Did he have conversations with you about that?

13   A.    Yes.

14   Q.    What did he tell you?

15   A.    That the girl that was -- that was going to come and

16  meet me, that the police had been following her and she had

17  thrown some drugs out the window of the car.

18   Q.    Did he tell you what location or what city that

19  occurred that she threw drugs out the window?

20   A.    I believe it was North Liberty.

21   Q.    Did you have other sources of crack cocaine and heroin

22  during this time period?

23   A.    Yes, I did.

24   Q.    Do you know whether Ben Boyd knew the defendant?

25   A.    Well, we saw him a couple times together so yeah, I

1    guess he did.

2        Q.    I am sorry, you said we saw him together.

3        A.    Yeah, there were I believe two times where Ben and I,

4    you know, went in together and got something.

5        Q.    Do you know an individual by the name of CC?

6        A.    Yes, I do.

7        Q.    Do you know whether she knew the defendant?

8        A.    I believe she did.

9        Q.    Is there a time -- did you ever stay at CC's house?

10       A.    Yes, I did.

11       Q.    During the time that you stayed there did you ever

12   have a transaction with the defendant at the house?

13       A.    No, you know, I don't recall.  I stayed there for

14   maybe two weeks.  It was definitely I think around that time,

15   yes; but when I was actually staying at the house, I couldn't

16   say for certain.

17       Q.    After a certain point did you continue to call the

18   defendant's phone and order drugs?

19       A.    I attempted to, yes.

20       Q.    Did you deal with anybody else after calling that

21   phone other than the defendant?

22       A.    There was -- yeah, there was one time later on when I

23   was -- when someone else answered the phone, yeah.

24       Q.    And who was this person?

25       A.    It was a female.  Again, I couldn't tell you for sure.

1     Q.   And when you -- when this female answered the phone,

2   it was the same number that you called for the defendant

3   previously?

4     A.   Yes.

5     Q.   When this female answered the phone did you order from

6   the female?

7     A.   Yes.

8     Q.   Did you do a transaction then with the female?

9     A.   Yeah, I believe I purchased heroin once.

10    Q.   And where did that transaction take place?

11    A.   That took place in North Liberty on Savannah, Savannah

12   Road, Savannah Drive.

13    Q.   And can you describe what type -- was it at a

14   residence or was it just in the street?

15    A.   Yes, it was a residence, it was like a -- kind of a

16   townhouse type.

17    Q.   Showing you what's been marked as Government's

18   Exhibits 25A and 25B, do you recognize that?

19    A.   It looks like the same place, yes.

20    Q.   The same place where you met the female?

21    A.   Correct.

22    Q.   Can you be for sure that that's the same place?

23    A.   Well, not 100 percent, but I would be pretty confident

24   in saying yes, it was.

25    Q.   In looking at Government's Exhibit 25B, is that the

1  same complex where the transaction occurred?

2      A.   It certainly appears so, yes.

3      Q.   And when did that transaction occur?

4      A.   December of '07.

5          MS. ZAEHRINGER:  Move to admit Government's Exhibits

6  25A and 25B.

7          MR. LEDDIN:  No objection, Your Honor.

8          THE COURT:  They are received.

9  BY MS. ZAEHRINGER:

10     Q.   Do you recall which one of these townhouses you met at

11 particularly?

12     A.   No.  I mean, they all -- the whole street, they all

13 kind of look the same.

14     Q.   When you went to that house did you see anybody else

15 there or was it just the female?

16     A.   It was just the female.

17     Q.   Could you tell whether there was anybody else that

18 resided there, any kids that resided there?

19     A.   There was some kids' toys.

20     Q.   Did you see any kids?

21     A.   I wouldn't be comfortable saying yes or no either way.

22     Q.   Had you seen this female previously in your dealings

23 with the defendant?

24     A.   Again, I wouldn't be comfortable saying 100 percent

25 either way.

1    Q.   And do you see Ricardo Townsend in the courtroom here

2   today?

3    A.   Yes, I do.

4    Q.   Can you tell me where he is seated and what he is

5   wearing?

6    A.   He is wearing -- he's seated right over here

7   (Indicating) and he's wearing a -- sort of a tan shirt or

8   jacket.

9    Q.   Do you go by any street names?

10    A.   I did, yeah, people called me Frenchie.

11    Q.   That's the name you used during the time period that

12   you were dealing with the defendant?

13    A.   This is correct, yes.

14         MS. ZAEHRINGER:  I have no further questions.

15         THE COURT:  We are going to take our mid-morning

16   recess and we will come back at 10:50.  We will see you then.

17         (A recess was taken from 10:29 a.m. until 10:50 a.m.)

18         (In the presence of the jury.)

19         THE COURT:  Please be seated.  Mr. Leddin, you may

20   cross-examine.

21         MR. LEDDIN:  Thank you, Your Honor.

22                    EXAMINATION

23   BY MR. LEDDIN:

24    Q.   Mr. Davis --

25    A.   Yes, sir.

1      Q.   -- isn't it true that you don't know the name of the

2   woman that you supposedly dealt with in December of 2007?

3      A.   Correct.

4      Q.   And you don't know the address of the residence that

5   you supposedly went to at this time?

6      A.   Well, yeah.   The exact address?

7      Q.   Correct.

8      A.   No, I don't.

9      Q.   In fact, isn't it true that the only information that

10  you have about this address is the information that you received

11  from the government about it?

12     A.   I was aware that it was on Savannah Drive.

13     Q.   But you don't know what the address is, the building

14  number, complex number, apartment number, you don't know any of

15  that, do you?

16     A.   The exact physical -- the exact number?

17     Q.   Correct.

18     A.   No.

19     Q.   And you were selling cocaine in Johnson County in 2006

20  and 2007?

21     A.   I've been accused of that.

22     Q.   Well, isn't it true that you testified that you sold

23  crack cocaine to a Benjamin Boyd and a Michael Robinson?

24     A.   Correct.

25     Q.   And I assume that you were selling crack cocaine to

1  other people besides those two?

2      A.    No.

3      Q.    Those are your only two customers?

4      A.    At that time?  I was mostly just using for myself.

5      Q.    And that you have just recently been charged with

6  conspiracy to distribute crack cocaine in the Southern District

7  of Iowa?

8      A.    Correct.

9      Q.    And you also have four other pending delivery of

10 controlled substance charges besides the conspiracy?

11     A.    This is correct, yes.

12     Q.    And that you have entered into a Proffer Agreement

13 with the government on those charges?

14     A.    Yes, I have.

15     Q.    And by entering into that Proffer Agreement with the

16 government you have indicated your intentions to plead guilty to

17 those charges, correct?

18     A.    Yes, I guess so.

19     Q.    So it is your intention to plead guilty to the

20 conspiracy offense?

21     A.    I'm -- I am not 100 percent on that.

22     Q.    Is it fair to say that you are facing a minimum of 20

23 years in prison and a maximum term of life in prison for these

24 five drug offenses?

25     A.    Correct, that's the potential penalty, yes.

1      Q.   And that the only way to avoid serving the minimum of

2   20 years in prison is to cooperate with the government?

3      A.   Correct.

4      Q.   And that you had a proffer interview with a federal

5   agent?

6      A.   Yes, I did.

7      Q.   And was that Agent Blomgren here today?

8      A.   Yes, sir.

9      Q.   And that during this interview Agent Blomgren asked

10  you about a number of different people?

11     A.   Correct.  We discussed several different people, yes.

12     Q.   And that he expected you to provide information on

13  every person that he named?

14     A.   If I knew them, yes.

15     Q.   And essentially your hope is that the more information

16  you gave him, the more names you gave him, that the lower your

17  potential sentence would be?

18     A.   Well, if I'm able to provide truthful information,

19  yes.

20     Q.   And with the hope, of course, is that the minimum

21  20-year sentence would be reduced?

22     A.   Correct.

23     Q.   And that your hope is to obtain a favorable Plea

24  Agreement?

25     A.   Correct.

1      Q.   And that's the reason why you are testifying here

2  today is your hope of getting a favorable Plea Agreement from

3  the federal government?

4      A.   Yes.

5      Q.   Have you -- before today have you previously testified

6  for the federal government?

7      A.   Yes.

8      Q.   How many times have you previously testified for the

9  federal government?

10     A.   Once.

11     Q.   And when was that?

12     A.   It was on my first case back in 2000.

13     Q.   And did you receive a benefit from testifying in that

14 case?

15     A.   Yes, I did.

16     Q.   What benefit did you receive?

17     A.   A reduced sentence.

18     Q.   And what was the charge that you received a reduced

19 sentence on?

20     A.   The charge that I was on my first arrest?

21     Q.   That you testified previously, what charge led you to

22 testify in that case?

23     A.   I believe it was conspiracy on heroin, to --

24     Q.   Was that the same conspiracy of heroin charge that you

25 talked about previously in your testimony?

1          A.    Correct.

2          Q.    And that what -- what jail sentence were you

3    potentially looking at if you did not cooperate?

4          A.    I believe it was an open-ended five to 40-year term.

5          Q.    And then by testifying what sentence did you actually

6    receive?

7          A.    Nine months in a halfway house, nine months ankle

8    bracelet.

9          Q.    So you went from looking at five to 40 years in prison

10   to essentially nine months?

11         A.    Correct.

12               MR. LEDDIN:  Thank you.  I have no further questions.

13               THE COURT:  Ms. Zaehringer, anything else?

14               MS. ZAEHRINGER:  Yes, Your Honor.

15                        FURTHER EXAMINATION

16   BY MS. ZAEHRINGER:

17         Q.    In your prior federal case did you learn what the term

18   safety valve meant?

19         A.    Yes, I did.

20         Q.    And what does that mean?

21         A.    It's a way that the government can go below the

22   Guidelines, the Sentencing Guidelines.  It is for people with a

23   low or no criminal history background.

24         Q.    And back in 2000 you didn't have a criminal history,

25   is that right?

1    A.    This is correct.

2    Q.    So to get below the five-year mandatory minimum the

3  safety valve was in effect in your particular case?

4    A.    Yes, it was.

5    Q.    So you were not facing the five to 40-year range based

6  on the safety valve application?

7    A.    Yes, if -- with the -- if the safety valve would have

8  been able to be applied.

9    Q.    And was it applied in your case?

10   A.    I believe it was, yes.

11        MS. ZAEHRINGER:  I have no further questions.

12        THE COURT:  Anything else, Mr. Leddin?

13        MR. LEDDIN:  No, Your Honor.

14        THE COURT:  Thank you.  You are excused.  Call your

15  next witness.

16        MS. ZAEHRINGER:  United States calls Officer Jess

17  Bernhard.

18                        JESS BERNHARD,

19  witness herein, called as a witness by the government, after

20  having been first duly sworn, was examined and testified as

21  follows:

22        THE COURT:  Use the microphone, pull up close to it,

23  bend it wherever you need to get it in front of your mouth, tell

24  us your name, spell your last name.

25        THE WITNESS:  Jess Bernhard, B-e-r-n-h-a-r-d.

EXAMINATION

BY MS. ZAEHRINGER:

    Q.    Where are you employed?

    A.    I work for the City of North Liberty Police
Department.

    Q.    How long have you been employed there?

    A.    Since 2005.

    Q.    Prior to that did you have any law enforcement
experience?

    A.    Yes, I worked for the City of Waukon as a police
officer.  I was also on the Northeast Iowa Drug Task Force
during that time for two years.

    Q.    And where is Waukon at?

    A.    I'm sorry?

    Q.    Where is Waukon at?

    A.    It is in Allamakee County in the far most northeast
part of the state.

    Q.    When did your law enforcement career begin then?

    A.    It started in '93 and I worked part time up until
2001.

    Q.    Can you describe what training you have in doing drug
investigations?

    A.    I went through the basic academy and got basic
intelligence information from them and I also acquired other
classes in the course of my duties.

1      Q.   And during the course of your duties you have

2  on-the-job training as well doing investigations?

3      A.   Yes.

4      Q.   Throughout the years do you have continuing education

5  on drug investigations and other police related matters?

6      A.   Yes.

7      Q.   Can you tell us how many drug investigations you have

8  been part of?

9      A.   Many.  Since I've been with North Liberty probably in

10  the fifties, 50 cases.

11      Q.   I am going to draw your attention to June 6th of 2007.

12  Were you on duty on that particular day?

13      A.   Yes.

14      Q.   And did you have occasion to go to number 13 at

15  Holiday Park?

16      A.   Yes.

17      Q.   Why did you go to that location?

18      A.   There was a disorderly conduct call that actually came

19  in to the adjoining trailer court in Golf View and several of

20  the witnesses said that I was looking for a subject by the name

21  of Paris.  I spoke with several juveniles as well and they said

22  they knew Paris to live in Holiday so I headed into Holiday

23  Trailer Court.

24      Q.   And how did you come about going to number 13?

25      A.   I had actually seen a black male, a tall black male

1  that fit the description of Paris approximately a week before in

2  the area of 13, there's a small driveway, or, excuse me, the

3  driveway that comes into Holiday and there's a grassy area that

4  he was sitting there, actually stopped and spoke with him.

5      Q.    When you approached 13 did you see a light on?

6      A.    Yes, I did.

7      Q.    And what did you do?

8      A.    I walked up onto the patio, knocked on the door,

9  announced myself, I heard footsteps and voices inside, and just

10  waited for the -- someone to answer the door.

11      Q.    Did somebody answer the door?

12      A.    Yes.

13      Q.    And who was he identified as?

14      A.    Sammy Glee.

15      Q.    And what did you do upon meeting with Sammy?

16      A.    I asked him if Paris was inside the trailer and he

17  said who is that, he is not inside, you can come inside and look

18  so we went inside.

19      Q.    And what did you observe when you went inside?

20      A.    Immediately upon walking in I smelled the burnt odor

21  of marijuana in the air and he became very nervous.  Once I saw

22  that there was marijuana in plain view on the table, he looked

23  at the marijuana, looked at me, looked at the marijuana, looked

24  at me, and reached down to pick -- actually burnt marijuana

25  cigarette up to conceal it.

1    Q.   Did you hear anything when you were entering into the

2  trailer?

3    A.   I heard a toilet flush in the back and I heard

4  footsteps moving around so I knew there was another -- at least

5  one more person in there.

6    Q.   What did you do at that point?

7    A.   I took Mr. Glee into custody, placed him on his chest

8  on the floor, went to the back area of the trailer, as I was

9  walking down the hallway, there was three doors along the left

10  wall.  As I passed one door I heard the toilet flush again and

11  then I heard what sounded like the toilet flush, but the toilet

12  didn't flush, I heard the handle actually clink a couple times

13  like it was trying to be flushed again and again.

14    Q.   And what did you do?

15    A.   I pushed the door open, the light was off, I shined my

16  flashlight in and saw another black male in there, pulled him

17  out, subsequently cuffed him and put him on the couch and then

18  put Mr. Glee on the couch and called for backup.

19    Q.   And who was the second individual identified as?

20    A.   Jabari Lee Roberison.

21    Q.   At that point what did you do?

22    A.   I called for backup and waited for the other officers

23  to come on scene and picked up the evidence that I had already

24  found.

25    Q.   At that point did you attempt to get a search warrant

1   for the residence?

2       A.   Yes, I did, I contacted the Drug Task Force and met

3   with Detective Blomgren and he and I went and got a search

4   warrant.

5       Q.   And was that search warrant executed at that

6   residence?

7       A.   Yes.

8       Q.   Did you partake in collecting evidence?

9       A.   Yes.

10      Q.   And what, if anything, did you find in the trailer?

11      A.   We located coffee grounds in the bathroom underneath

12  the vanity and that's typically used for the concealment of

13  odors of narcotics so I asked another officer if there was any

14  other coffee in the trailer and he found two large coffee --

15  Folgers coffee cans, plastic red jugs and when we opened one of

16  them up, there was a package inside containing approximately

17  29.7 grams of prepackaged cocaine and in smaller other packages.

18      Q.   During the search warrant were photographs taken?

19      A.   Yes.

20      Q.   Showing you what's been marked as Government's

21  Exhibits 20B through 20H, do you recognize those photos?

22      A.   Yes, I do.

23      Q.   Are those the photographs that were taken of the

24  evidence and of the trailer on June 6, 2007?

25      A.   Yes.

1    MS. ZAEHRINGER:  Mover to admit Government's Exhibits

2  20B through 20H.

3         MR. LEDDIN:  No objection, Your Honor.

4         THE COURT:  They are received.

5  BY MS. ZAEHRINGER:

6    Q.   Showing you what's been marked as Government's 20B,

7  can you tell us what is shown in this picture?

8    A.   This is a picture of the kitchen-dinette area actually

9  taken from the living room area.  The -- there would be linoleum

10  in the foreground and carpet in the living room area behind it

11  where I'd be taking the picture from.

12    Q.   Where was the coffee can found that contained the

13  crack cocaine?

14    A.   In the far right-hand corner of the room, there was --

15         THE COURT:  You can use your finger right on that.

16  Press hard.

17         THE WITNESS:  Okay.  In the far -- whoops.  Try this

18  again.  Apparently it is not working.  In the far right-hand

19  corner, the light fixture -- see if I can do this again.

20         THE COURT:  There's an erase button on the screen,

21  clears the entire screen.

22         THE WITNESS:  Okay.  Not too savvy with this stuff.

23         THE COURT:  It was only about $25,000 for that screen.

24  We want it to work, but I am kidding about the 25,000.

25         MS. ZAEHRINGER:  Not working at all.

1          THE WITNESS:  I think I broke it.  Would you like me

2   to get up and point on the screen?

3   BY MS. ZAEHRINGER:

4      Q.   Can you see the -- did you tell us what location it

5   was as far as was it on an object?

6      A.   It was actually on top of the refrigerator.  If you

7   look in the far right-hand corner, you can actually see the

8   hinge of the refrigerator.

9      Q.   Right there?  (Indicating)

10     A.   Yes, it was right on top of that refrigerator there.

11     Q.   Thank you.  20C, can you tell us what is depicted

12  here?

13     A.   This is actually a picture of the box that we found

14  much of the packaging material in.  In the bottom right next to

15  the linoleum strip where it attaches to the carpet and linoleum,

16  there's two packages that are small packages that we found

17  marijuana in and all of the clear cellophane bags contain other

18  clear cellophane bags, some of which had been cut into.  If you

19  took a Ziploc baggie or a clear sandwich bag and snipped the

20  corner off, many of those were found inside that large bag

21  inside the box.

22     Q.   And what is packaged in the corners of baggies?

23     A.   Typically crack cocaine or marijuana.

24     Q.   20D, what is shown here?

25     A.   These are the Folgers containers that were actually on

1  top of the refrigerator containing the prepackaged crack

2  cocaine.

3      Q.   And the crack was only located in one of the

4  containers, is that correct?

5      A.   That is correct.

6      Q.   In the container was there also coffee grounds?

7      A.   Yes.

8      Q.   20E, what is depicted here?

9      A.   This is the large sandwich baggie containing smaller

10 pieces of packaged crack cocaine.

11     Q.   20F, what is depicted here?

12     A.   This is actually a reverse of the first picture, this

13 is the living room area.  The black table with the glass knocked

14 out of it was actually in the center of the room, that's what

15 Mr. Glee attempted to conceal the narcotics from.

16     Q.   20G?

17     A.   This would be the hallway leading to the back bedroom.

18 The door there on the left that's open is where the bathroom is

19 at where I found Mr. Roberison.

20     Q.   And there seems to be another door to the right here.

21     A.   That's actually an exit door, correct.

22     Q.   20H?

23     A.   This is the back bedroom where I found the other

24 pieces of marijuana in the trash can, it was actually sitting

25 right next to the middle of the bed there.

1    Q.    This is a one-bedroom trailer?

2    A.    Yes.

3    Q.    Upon searching the trailer you also collected the

4    physical evidence?

5    A.    Yes.

6    Q.    Government's Exhibit 17, do you recognize that?

7    A.    That is the Folgers coffee container that contained

8    the crack cocaine.

9    Q.    Exhibit 16, do you recognize that?

10   A.    That is the digital scale that was found underneath

11   the couch right -- in the living room area right next to where

12   we found all the packaging material.

13   Q.    Was there anything on this scale when you recovered

14   it?

15   A.    It was closed up, there was dust, white -- white

16   powdery substance that appeared to be crack cocaine or cocaine.

17   Q.    Government's Exhibit 15, do you recognize that?

18   A.    This is the packaging material that was found in the

19   box and on the table.  It was a large roll of Ziploc baggies and

20   then there's other baggies in here that contain the corner tears

21   that have been already used I assume.

22   Q.    Exhibit 14?

23   A.    That is a -- what I believe to be a piece of black tar

24   heroin.  When I first came into the residence it was actually

25   sitting on the coffee table, but then during the search warrant

1    was actually found underneath the chair.  I assume it got

2    knocked off during the struggle.

3        Q.   When you collected 14, as you feel it today, as you

4    feel that substance, is that the way it appeared when you

5    collected it?

6        A.   No, it was much softer and pliable.

7        Q.   And Exhibit 13?

8        A.   These are the individual packets of crack cocaine

9    after they have come back from the DCI for testing.

10        MS. ZAEHRINGER:  Move to admit Government's Exhibits

11   17 through 13.

12        MR. LEDDIN:  No objection, Your Honor.

13        THE COURT:  They are received.

14   BY MS. ZAEHRINGER:

15        Q.   Were you involved in sending any of the items to the

16   DCI laboratory?

17        A.   No, I was not.

18        Q.   Your job was just to collect the evidence?

19        A.   That's correct.

20        Q.   Were there other documents that were collected at the

21   residence by Detective Blomgren?

22        A.   Yes.

23        Q.   During your work while in North Liberty did you know

24   the defendant to reside in North Liberty?

25        A.   Yes.

1    Q.   And where did the defendant reside?

2    A.   728 Savannah Village.

3    Q.   During the time that you were working in North Liberty

4  did you have an occasion to run the license of Ricardo Townsend?

5    A.   Yes.

6    Q.   Did you also run the license for Litkesha Rice?

7    A.   Yes.

8    Q.   Did you run an electric company request as far as who

9  the electricity went back to for 728 Savannah?

10   A.   It was actually the water bill through the city which

11 we all have access to at the police department.  It is the top

12 one here, 24.

13   Q.   Okay.  And 23 and 22?

14   A.   These are actually the licenses that I ran and

15 requested from dispatch.

16        MS. ZAEHRINGER:  Mover to admit Government's Exhibits

17 22 through 24.

18        MR. LEDDIN:  No objection, Your Honor.

19        THE COURT:  They are received.

20 BY MS. ZAEHRINGER:

21   Q.   Exhibit 22, what does this tell us?

22   A.   It gives us Ricardo Townsend's address and driving

23 status.

24   Q.   And this -- is this meaning that he has a license or

25 an ID for the State of Iowa?

1    A.   Yes, it has a barred status.

2    Q.   So it would just be an ID, a nondriver's ID?

3    A.   Yes.

4    Q.   And Exhibit 23, what does this tell us?

5    A.   This is Litkesha Rice's driver's license information.

6    Q.   And does it show us an issue date of this license?

7    A.   Yes, it does, it says 2007, 4-21.

8    Q.   And it lists the same address as Exhibit 22 being 728

9    Savannah Drive?

10   A.   Yes.

11   Q.   And Exhibit 24, what is this document?

12   A.   This is the water service agreement with the city.

13   Q.   Can you tell us whose name that's in?

14   A.   Litkesha Rice.

15   Q.   And what address is that for?

16   A.   728 Savannah Drive.

17   Q.   Can you tell from this document when the water was

18   turned on at that residence?  I don't know if you can.

19   A.   7-13-2005.

20   Q.   When you ran this it was -- this was the current --

21   the name -- this name was the current service?

22   A.   Yes.

23   Q.   The date at the bottom of this document, does that

24   indicate around the time when you ran the water bill?

25   A.   Yes, that's correct.

1    Q.    While you were working in North Liberty did you know

2    the defendant to drive a particular vehicle?

3    A.    Yes, it was a gray Dodge Magnum wagon with dark tinted

4    windows.

5    Q.    Did you know anybody else to drive that vehicle?

6    A.    Litkesha Rice.

7    Q.    Did you have occasion to see that vehicle at trailer

8    13 on occasion?

9    A.    Yes.

10   Q.    I draw your attention to August 22nd of 2007.  Did you

11   have occasion to do a search warrant at 728 Savannah?

12   A.    Yes.

13   Q.    On that occasion what evidence did you find?

14   A.    Nine pill bottles with Mr. Townsend's name on them,

15   nothing else of consequence other than a -- we seized a

16   camcorder that was inoperable.

17   Q.    The pill bottles with the defendant's name on them,

18   these are prescription drugs?

19   A.    Yes.

20   Q.    Did you recover any pictures at that location?

21   A.    There were numerous pictures taken, several of which

22   show Mr. Townsend with narcotics, using narcotics, and another

23   one with money, a large quantity of money in his hand.

24   Q.    Did you collect those items?

25   A.    We did.

1    Q.    And put them in evidence?

2    A.    Yes.

3    Q.    Do you still have those in evidence today?

4    A.    No, ma'am.

5    Q.    Why not?

6    A.    The evidence was purged as of I believe February 1st.

7    Q.    Meaning that it was destroyed?

8    A.    That's correct.

9    Q.    Is there a police department policy about how many

10   months go by and when destruction happens with the evidence?

11   A.    Upon finish of the case or entry of a disposition of

12   either a dismissed or a guilty plea or, you know, something

13   that's taken place that has basically cleansed the case, we get

14   rid of them after a year.

15   Q.    And in the search warrant in August of 2007, the

16   defendant wasn't charged with anything so there was no

17   disposition or the case was closed?

18   A.    That's correct.

19   Q.    Do you see Ricardo Townsend in the courtroom today?

20   A.    Yes.

21   Q.    Can you tell me where he is seated and what he is

22   wearing?

23   A.    He's sitting to the right of you in it looks like a

24   brown shirt.

25         MS. ZAEHRINGER:  I have no further questions.

1          THE COURT:  Mr. Leddin?

2          MR. LEDDIN:  Thank you, Your Honor.

3                       EXAMINATION

4   BY MR. LEDDIN:

5          Q.   Officer Bernhard, first of all I would like to talk to

6   you about Government Exhibit 22, it's the driver's license

7   record of Ricardo Townsend.

8          A.   Yes, sir.

9          Q.   First of all, it is fair to say that Mr. Townsend

10  never had a driver's license in the state of Iowa?

11         A.   That's incorrect.

12         Q.   But it shows here on Exhibit 22 that he's barred so he

13  couldn't potentially have a driver's license in the state of

14  Iowa.

15         A.   That's a status.  You can have a driver's license, but

16  it is a barred status.

17         Q.   So essentially it would be more like an ID card, if

18  anything?

19         A.   They -- the state does issue ID only cards, but this

20  was actually a driver's license that he possessed for some time.

21  I don't recall when he actually got it.

22         Q.   But his driving status in the state of Iowa was

23  barred?

24         A.   That's correct, after a certain number of driving

25  while suspended citations I assume.

1    Q.   And then on Government's Exhibit 22 it shows that his

2  mailing address is 1701 State Street in Calumet City, Illinois,

3  is that true?

4    A.   I believe so.

5    Q.   Would you like to review that exhibit?

6    A.   Please.  For mailing address that is correct, the

7  residence is actually 728.

8    Q.   So it clearly lists on this Government Exhibit 22 that

9  his mailing address is 1701 State Street in Calumet City,

10 Illinois?

11   A.   Yes.

12   Q.   Now, concerning Government's Exhibit 24, the water

13 bill, does it show anywhere on here the date that Litkesha Rice

14 moved out of the address located at 728 Savannah Drive?

15   A.   No, I don't believe it does.

16   Q.   Concerning the search of 728 Savannah Drive, was there

17 anything illegal found during the search?

18   A.   Not to my knowledge.

19   Q.   So that's why no charges were filed against Miss Rice

20 or anyone else because nothing illegal was found?

21   A.   That's correct.

22   Q.   And that there were nine pill bottles found with Mr.

23 Townsend's name on it?

24   A.   Yes.

25   Q.   However, they were prescription drugs which is

1  perfectly legal for him to possess?

2      A.   Correct.

3      Q.   And really that's the only thing that you found of Mr.

4  Townsend's at this residence was nine pill bottles?

5      A.   Yes.

6      Q.   And that these so-called pictures that were taken or

7  that were found with Ricardo in them, they have been destroyed?

8      A.   That is correct.

9      Q.   And so we are not able to see them here today?

10     A.   That's correct, sir.

11     Q.   Concerning the search of the -- of trailer number 13

12 at the Holiday Court, isn't it true that there was no working

13 power to this trailer?

14     A.   I don't recall, sir.

15     Q.   And that the only two individuals found in this

16 trailer were Sammy Glee and Jabari Roberison?

17     A.   That's correct.

18     Q.   And that Mr. Townsend was not at that trailer?

19     A.   No.

20     Q.   And that inside the residence you immediately smelled

21 burnt marijuana?

22     A.   Yes.

23     Q.   And that you found -- you immediately saw marijuana

24 sitting on a table directly in front of Sammy Glee?

25     A.   That's correct.

1      Q.   And that Sammy Glee tried to conceal it by picking it

2  up and hiding it?

3      A.   That is correct.

4      Q.   And that you or another police officer charged Sammy

5  Glee with possession of a controlled substance as a result of

6  that?

7      A.   Yes.

8      Q.   And that also that the coffee can containing the 29.6

9  grams of crack cocaine, that was found in the area of where

10  Sammy Glee was arrested, isn't that true?

11      A.   Yes.

12      Q.   And that you or another agent or officer had a chance

13  to talk to Jabari Roberison?

14      A.   Yes.

15      Q.   And that Jabari Roberison admitted to smoking

16  marijuana in that trailer?

17      A.   Yes.

18      Q.   And that you or another police officer also arrested

19  Jabari Roberison for possession of a controlled substance?

20      A.   Yes.

21      Q.   And to your knowledge have both of these individuals

22  pled guilty to these two offenses?

23      A.   I don't know what the outcome of those charges were,

24  sir.

25           MR. LEDDIN:   Thank you.  I have no further questions.

1           THE COURT:  Ms. Zaehringer, anything else?

2           MS. ZAEHRINGER:  No, Your Honor.

3           THE COURT:  Thank you, sir.  You are excused.

4           THE WITNESS:  Sorry about your computer, Judge.

5           THE COURT:  Not as sorry as me and not as sorry as

6    somebody in the IT department is going to be.

7           MS. ZAEHRINGER:  United States calls Jerry Blomgren.

8           THE COURT:  Please come forward, sir.

9                          JERRY BLOMGREN,

10   witness herein, called as a witness by the government, after

11   having been first duly sworn, was examined and testified as

12   follows:

13          THE COURT:  When you are comfortably seated there,

14   state your name and spell your last name.

15          THE WITNESS:  My name is Jerry Blomgren, last name is

16   spelled B-l-o-m-g-r-e-n.

17          THE COURT:  Go ahead.

18                          EXAMINATION

19   BY MS. ZAEHRINGER:

20        Q.   Can you tell us where you are employed?

21        A.   Yes, I'm employed with the City of Iowa City Police

22   Department.

23        Q.   How long have you been employed there?

24        A.   Been with Iowa City for just a little over 12 years

25   now.

1      Q.    And what is your main assignment with them?

2      A.    I currently am assigned as the narcotics investigator

3   for the Iowa City Police Department.

4      Q.    And are you a member of any drug task forces?

5      A.    Yes, currently I'm assigned to the Johnson County

6   Multi Agency Drug Task Force and the DEA Drug Task Force with an

7   office in Cedar Rapids, Iowa.

8      Q.    Prior to Iowa City did you work as a police officer

9   anywhere else?

10      A.    Yes, I did, I spent three years as a police officer

11   with the City of Pella.

12      Q.    Can you tell us about your training and experience in

13   doing drug investigations?

14      A.    Yes, in addition to the Iowa Law Enforcement Academy

15   which I attended in 1994, I went to the DEA basic narcotics

16   school, I believe it was 1999, possibly 2000.  Since that time I

17   have had numerous other courses relating to narcotics

18   investigation including identification of drugs, search and

19   seizure law, interview and interrogation.

20      Q.    During your training have you come in contact with all

21   different types of narcotics?

22      A.    Yes, I have.

23      Q.    Including crack cocaine, powder cocaine, heroin?

24      A.    Yes.

25      Q.    How many drug investigations have you been part of?

1    A.    Prior to taking over the narcotics investigative

2  position in January of 2006 I was a member of the Street Crimes

3  Unit in Iowa City for five years so for the last roughly eight

4  plus years that's more or less all I've done.  I couldn't really

5  estimate how many, but it would easily be in the hundreds.

6    Q.    As part of your investigation of drug cases is it your

7  job to collect information from different witnesses to put the

8  pieces together?

9    A.    Yes.

10    Q.    And while you are doing this do you come in contact

11  with drug users?

12    A.    Yes.

13    Q.    What type of information are you getting from drug

14  users?

15    A.    The users will tell us -- I guess the main thing is

16  where they're getting their drugs.

17    Q.    Is this helpful information to you?

18    A.    Yeah, it helps us put the pieces of the puzzle

19  together so we get a little more accurate picture of what is

20  going on.

21    Q.    During your investigation do you speak with

22  co-operators, confidential informants?

23    A.    Yes, I do.

24    Q.    And do they give you information about drug dealers

25  and other drug users?

1      A.    Yes.

2      Q.    And do you put that again with the information that

3  you have received from just the users?

4      A.    Yes.

5      Q.    During investigations do you do proffer interviews?

6      A.    Frequently.

7      Q.    And what are proffer interviews?

8      A.    Proffer interviews, an interview is set up, usually

9  arranged between one of the Assistant United States Attorneys

10  and the defense attorney for typically a person that is in

11  federal custody.

12      Q.    And what takes place at proffer interviews?

13      A.    It's explained to the individual what the interview is

14  being conducted on, what is expected of them is the truth about

15  their activities, and not only what they were doing, but what

16  other people they were involved with were doing.  In

17  consideration of that they may get a reduction of their sentence

18  later on.

19      Q.    In this case it involves Ricardo Townsend.  When did

20  you first start investigating this defendant?

21      A.    I believe the first I was hearing about Mr. Townsend

22  was probably the end of 2006 going into the beginning of 2007.

23      Q.    And how did this investigation continue?

24      A.    It was kind of a slow process trying to figure all of

25  this out.  We'd been seeing a tremendous increase in cocaine,

1  more specifically crack cocaine in the Iowa City area from 2005

2  into 2006, we were doing a lot of work trying to figure out why

3  we're getting all this increase in drugs, specifically crack

4  cocaine.  Through that year, 2006, we were doing a lot of

5  investigations revolving specifically around crack cocaine.

6  　　　　　As we got further through the year, we were developing

7  cases where people were coming into custody and during those

8  interviews, Ricardo Townsend's name started to come up so as we

9  go through the end of 2006 into 2007, like I said earlier, the

10 pieces of the puzzle are becoming a little more clear and it was

11 becoming very clear to us that Mr. Townsend was a significant

12 person in the area in the distribution of crack cocaine.

13 　　　　Q.　During this investigation of the defendant was there

14 an opportunity to use a confidential informant to do a

15 controlled purchase of the defendant?

16 　　　　A.　Not in this case.

17 　　　　Q.　Why not?

18 　　　　A.　I think there's a couple reasons.  Certainly we would

19 prefer to do that when it is a possibility.  There were some

20 people that -- mostly they were in custody.  We would work up to

21 a person and by the time we got to them, we would already have

22 them in a position where they were indicted and not able to go

23 out and actively purchase drugs from Mr. Townsend.  There were

24 also some people that were very fearful of Mr. Townsend.

25 　　　　Q.　During this investigation you talk about taking people

1    in custody.  Are these people as far as the spectrum of where

2    they fit with this case, are they under Mr. Townsend, are they

3    above Mr. Townsend?

4        A.    They're under.

5        Q.    So you're talking about lower level dealers?

6        A.    Lower than Mr. Townsend, yes.

7        Q.    And these people that -- can you name some of these

8    people that you were talking about that you are doing

9    investigations on?

10       A.    Some of the people that we've heard from here the last

11   couple days, Daniel Davis, Benjamin Boyd, William Branch, Daniel

12   Lucas, Dennis Ogburn.

13       Q.    During the investigation you found information about

14   -- let's just pick Dennis Ogburn --

15       A.    Yes.

16       Q.    -- and you developed a case on him?

17       A.    Correct.

18       Q.    Took him into custody?

19       A.    Correct.

20       Q.    And so he's not available to do an informant buy from

21   the defendant?

22       A.    That's correct, because he would have been in custody.

23       Q.    This particular case we heard about crack cocaine and

24   powder cocaine.  Can you tell us the difference between the two?

25       A.    Crack cocaine is basically cocaine in its base form.

1  It is converted in a process cooking it with baking soda, heated

2  up, and the best way to describe it, it turns cocaine powder

3  into a smokable form of the drug.  If you tried to smoke powder

4  cocaine, it would light on fire.  Converting it to its base

5  form, crack cocaine, allows it to be heated up and ingested

6  through inhalation which leads to a different kind of high than

7  regular powder cocaine would.

8      Q.   Can you tell us how addictive crack cocaine is?

9      A.   Very addictive.

10     Q.   We heard about -- let me back up here.  Crack cocaine,

11 what is the typical dosage unit of crack?

12     A.   The typical dosage unit to me is probably two-tenths

13 of a gram to a half a gram is what I think a user would be

14 somewhere in that area of using.

15     Q.   We heard information about eight balls.  Can you tell

16 us again what the weight of an eight ball is?

17     A.   An eight ball is 3.5 grams of product.

18     Q.   And we heard information about a 63, that means 63

19 grams, is that correct?

20     A.   That is correct.

21     Q.   As far as 63 grams worth, is that a user amount?

22     A.   No, it is not.

23     Q.   Is that something that would be then distributed to

24 other users?

25     A.   Yes.

1  Q. Or dealers?

2  A. Absolutely.  A 63-gram quantity is actually a very

3 significant quantity of crack cocaine.

4  Q. Can you tell us, we heard information about a $50 rock

5 and a $100 rock.  What weight is typically a $50 rock?

6  A. $50 rocks are generally going to be in the ball park

7 of a half a gram.

8  Q. And a $100 bag?

9  A. Should be around a full gram.

10  Q. We heard information about heroin in this case.  Can

11 you tell us the forms heroin comes in?

12  A. There are different forms of it.  There is black tar

13 heroin which is kind of a black tarry substance.  Officer

14 Bernhard testified that's what he felt that substance was that

15 was found in the trailer that night.  There's also a powder form

16 of heroin that looks significantly different, it is a little bit

17 more like coca powder to me.

18  Q. Can you comment on the addictiveness of heroin?

19  A. Heroin is also addictive.  I'm not sure if it has got

20 quite the power of crack cocaine, but it certainly is a very

21 addictive drug.

22  Q. Can you tell us how heroin is packaged for resale?

23  A. It's packaged similarly to other drugs like crack

24 cocaine, it can be -- it is usually smaller quantities.

25 Typically what we see is a user quantity of heroin is going to

1  be a little smaller than a user quantity of crack cocaine; but

2  as far as packaging, it can be in a little bit of a corner or a

3  baggie and tied off or it can be wrapped up in a piece of tin

4  foil, folded up in a little piece of paper, any small container

5  like that.

6      Q.   What is the most common way you see crack and heroin

7  packaged?

8      A.   By far the most common way that I see is in the corner

9  of a plastic baggie.

10     Q.   We heard information about a front.  Can you just

11 describe what a front means?

12     A.   It just simply means that the drug is given to a

13 person, a dealer, for nothing and with the expectation that that

14 person is going to sell that, bring back the money later for

15 that drug.

16     Q.   We heard information that the crack cocaine in this

17 particular case was coming from Chicago.  Is Chicago a source

18 city to the Iowa City area?

19     A.   Yes.

20     Q.   We heard testimony regarding it being profitable to

21 sell in the Iowa City area versus -- more profitable than

22 selling in the Chicago area.  Based on your training and

23 experience is that what you find as well?

24     A.   Absolutely.  Through many, many interviews that's a

25 question that will come up, why did you come to Iowa City and

1  it's what we hear.  We can make a lot more money.

2      Q.    During your investigations you have done search

3  warrants?

4      A.    Yes, ma'am.

5      Q.    And when executing a search warrant, have you had

6  occupants attempting to destroy evidence?

7      A.    On occasion, yes.

8      Q.    As far as crack cocaine goes, what's a way that a

9  person can destroy that evidence?

10     A.    Well, the most common way that we see obviously is

11 flushing it down the toilet.  They can try to conceal it from

12 us, put it in a place where they don't think we're going to find

13 it, but probably the best way to get it out of the residence

14 that we're not going to find it is to flush it down the toilet.

15 There's not too many other places that we won't possibly find it

16 in the residence.

17     Q.    Based on your training and experience with users, do

18 you see users buying larger amounts and brokering deals between

19 other users to support their habit?

20     A.    Yes, I frequently see that.

21     Q.    Is that a common practice?

22     A.    Yes, it is.

23     Q.    In search warrants when you collect evidence, do you

24 tag that evidence and send it to the DCI laboratory?

25     A.    Yes.

1    Q.   You were responsible for that in this particular case?

2    A.   Yes, I was.

3    Q.   When you send evidence to the DCI laboratory at times

4  do you request fingerprints be done or attempted to find on

5  certain items?

6    A.   Yes, I do.

7    Q.   In this particular case did you ask DCI to look for

8  fingerprints?

9    A.   I did.

10   Q.   On what items?

11   A.   I believe on the drug evidence that was submitted.

12   Q.   On what part of the drug?

13   A.   Well, the packaging, in this case it was repackaged in

14  plastic baggies.

15   Q.   During the investigations that you have been part of,

16  what is the success rate of getting fingerprints off of the

17  smaller bags, the one-gram bags of crack?

18   A.   It's slim to none.  It just doesn't happen.

19   Q.   In this particular investigation were you -- did you

20  issue a subpoena for phone records?

21   A.   I did.

22   Q.   Did the company send you phone records?

23   A.   They were sent to the DEA office I believe in Cedar

24  Rapids.

25   Q.   And what did you do with these records?

1    A.    I reviewed them.

2    Q.    And what numbers were of particular interest in this

3  particular case?

4    A.    Well, like I said, we'd been hearing about the name

5  Ricardo Townsend, we identified him as a significant source, so

6  we were certainly looking at that name and that number.

7    Q.    When Prince Ferguson was arrested did he have a cell

8  phone on his person?

9    A.    Yes, he did.

10   Q.    Typically in drug investigations do you download or

11 note the information contained within the phone?

12   A.    Yes, we do.

13   Q.    And why do you do that?

14   A.    We do that to see who -- obviously who the person is

15 dealing with, we may be able to tie them into their other

16 customers or of more interest their dealer.

17   Q.    Showing you what's been marked as Government's Exhibit

18 5, do you recognize those documents?

19   A.    Yes, I do.

20   Q.    And what do you recognize those documents to be?

21   A.    These are phone call results from that request, I

22 believe it was done -- the run date on here says 2-15 of 2007.

23 This is in reference to the phone, cellular phone that Prince

24 Ferguson had in his possession when he was taken into custody.

25   Q.    From that phone download were you able to determine a

1   number that he used to contact the defendant?

2       A.   Certainly one of the numbers in there, in his phone

3   contacts that we looked at was under the name of Ricardo.

4       Q.   And speaking with Prince Ferguson did he indicate that

5   that's the phone number he used to contact the defendant?

6       A.   Yes, he did.

7       Q.   And obtaining these records, did you then or did the

8   computer then generate a chart showing the calls to and from

9   Prince Ferguson and the defendant?

10      A.   Yes.

11      Q.   I should say the cell phones of those individuals.

12      A.   Yes, there was something generated in the computer

13  system by our analyst that does the phone stuff up at the DEA

14  office.

15          MS. ZAEHRINGER:  Move to admit Government's Exhibit 5.

16          MR. LEDDIN:  Your Honor, I don't object to the actual

17  admittance of the phone records; however, I do object to the

18  cover used for that exhibit.  I believe the cover is not

19  produced within the regular conducted business activity, but I

20  believe that the rest of the phone records are.

21          THE COURT:  The first page will be admitted for

22  demonstrative purposes only, meaning that you can use it with

23  the jury and in your closing argument, but it will not be sent

24  back as an exhibit.  The rest of it is received.

25

1  BY MS. ZAEHRINGER:

2       Q.   I am showing you now what is the first page of

3  Government's Exhibit 5.  These are the phone calls taking place

4  between the two phone numbers, is that correct, if you can read

5  it?

6            THE COURT:  It is shut down remotely from Des Moines.

7  They are working on it right now so you are not going to have

8  that for a while.

9            MS. ZAEHRINGER:  Thanks.

10      Q.   The first page, does that show the phone calls that

11 were coming from and going to the two phone numbers that you

12 analyzed?

13      A.   Yes.

14      Q.   And now the second, third, and fourth pages, that's

15 the download from Prince Ferguson's phone, is that correct?

16      A.   Yes, that shows the phone contacts.

17      Q.   During your analysis a chart was generated.  Did you

18 recall how many phone calls were from Prince Ferguson's number

19 to the defendant's phone number?

20      A.   Looking at it from here, I believe it was -- is that

21 16?  I don't recall, no.  18.

22      Q.   And how many calls were from the defendant's number to

23 Ferguson's number?

24      A.   29.

25      Q.   I am going to draw your attention to June 6th of 2007.

1    Did you participate in a search of Number 13 Holiday Park Court?

2        A.    Yes, I did.

3        Q.    And what did you do during that -- the execution of

4    the search warrant?

5        A.    I mainly searched in the back bedroom.  There was a

6    photo earlier where a mattress was laying on the floor.  It was

7    actually the only bedroom of the trailer.

8        Q.    And what did you collect, if anything, while in that

9    bedroom?

10       A.    Mostly what I was looking at were paper documents, I

11   did collect some of those.

12       Q.    Do you recall what items you collected?

13       A.    There was a -- I know there was a Western Union I

14   guess receipt, there was information or documents with the name

15   of Prince Ferguson and Ricardo Townsend that were obviously of

16   interest to me.

17       Q.    And they were -- the name Prince Ferguson was of

18   interest to you because why?

19       A.    Prince Ferguson was involved in another case that I

20   had been working on and he -- at the time we did that search

21   warrant he had already been in custody for some time.

22       Q.    Showing you Government's Exhibits 10, 11, and 12, are

23   those documents that you retrieved from the trailer on that

24   night?

25       A.    Yes.

1    Q.   In looking at Government's Exhibit 10, what does this

2  show us?

3    A.   It appears to be a monthly statement from the Holiday

4  it says Mobile Home Courts and Sales in the name of of Ricardo

5  Townsend.

6    Q.   What is the date of this monthly statement?

7    A.   This one is March 1st of 2007.

8    Q.   And Government's Exhibit 11, can you describe what

9  that is?

10   A.   It's a Western Union money order I guess is how they

11  describe that showing that Prince Ferguson had sent via Western

12  Union $500 to Ricardo Townsend and I believe this one was dated

13  June -- June 13th of '06 so approximately a year prior to the

14  search warrant being executed.

15   Q.   And that document is the one that Prince Ferguson

16  testified to yesterday?

17   A.   Yes, it is.

18   Q.   You collected Government's Exhibit 12 from the trailer

19  as well?

20   A.   Yes.

21   Q.   And what does that show us?

22   A.   This is also a Western Union receipt showing $350 was

23  sent to Monica Autrey.

24   Q.   And who is it sent from?

25   A.   DeVaughn Glee.

1    Q.   During your investigation do you know a DeVaughn Glee?

2    A.   Yes, I do.

3    Q.   And who do you know that to be?

4    A.   DeVaughn Glee is one of three brothers, three Glee

5    brothers that we had information were all involved in the

6    distribution of crack cocaine in the Iowa City area.

7    Q.   Did you know whether they were associated -- whether

8    he specifically was associated with the defendant?

9    A.   Yes, I'm not sure at the time how I knew he was

10   connected, but certainly in subsequent investigation I was made

11   aware that all of the Glee brothers had an association with the

12   defendant.

13   Q.   And the individual at the trailer that night, Sammy

14   Glee, is he one of the Glee brothers?

15   A.   Yes, he's the Glee brother that goes by Cuzzo.

16        MS. ZAEHRINGER:  Move to admit Government's Exhibits

17   10 and 12.  I believe 11 is already admitted.

18        MR. LEDDIN:  No objection, Your Honor.

19        THE COURT:  10 and 12 are received.

20   BY MS. ZAEHRINGER:

21   Q.   We also talked about the other evidence that was found

22   at the trailer, the crack cocaine in the coffee can and you sat

23   in court and you saw that presented?

24   A.   Yes.

25   Q.   And based on the information known to you and the

1    evidence at the trailer, do you have an opinion as to whether

2    that amount found was for personal use or for distribution?

3        A.    Distribution.

4        Q.    Showing you what's been marked as Government's

5    Exhibits 18 and 19, can you tell us what Government's Exhibit 18

6    is?

7        A.    Exhibit 18 is DCI laboratory results that were

8    returned reference the crack cocaine that was located inside the

9    trailer at the Holiday Lodge.

10       Q.    And what does that document tell us?

11       A.    It tells that -- that the -- the substance found in

12   the coffee can was cocaine base.  It also says that the black

13   substance that we suspected at the time to be potentially black

14   tar heroin was not found to contain any controlled substance.

15       Q.    In that document does it show the -- that they tested

16   each individual bag that was submitted to them?

17       A.    Yes, they did.

18       Q.    Does it show a weight for each individual bag?

19       A.    Yes, it does.

20       Q.    In looking at the weights, does it look like the

21   average is approximately one gram?

22       A.    Yes.

23       Q.    Government's Exhibit 19, can you tell us what that is?

24       A.    That's a DCI lab report.

25       Q.    What does it tell us?

1      A.    It's the results basically on the fingerprint analysis

2   that was requested on the substance that was submitted for

3   analysis.

4      Q.    And what was actually fingerprinted?

5      A.    The baggies that the crack cocaine was located in,

6   also the black substance that we had submitted that didn't have

7   any controlled substance in it.

8      Q.    And what were the results of the baggies with the

9   crack cocaine in it?

10     A.    There were no fingerprints -- identifiable

11  fingerprints located.

12     Q.    And what about the black tar substance that was

13  submitted?

14     A.    Surprisingly it did show a -- it says here a latent

15  palm print, but it did not match the suspects that were

16  submitted with it.

17     Q.    And what suspects' names were submitted or what prints

18  were submitted to do the comparison with?

19     A.    Just the two individuals that were located inside the

20  residence at that time, that being Jabari Roberison and it says

21  Pahan Allen, but it is actually Sammy Glee, that is just an

22  alias for him.

23          MS. ZAEHRINGER:  Move to admit Government's Exhibits

24  18 and 19.

25          MR. LEDDIN:  No objection, Your Honor.

1          THE COURT:  They are received.

2          MS. ZAEHRINGER:  Your Honor, we also do have a

3     stipulation that I would like to read to the jury.

4          THE COURT:  Members of the jury, from time to time the

5     lawyers in the case will get together before trial and agree

6     that they're just not going to argue about certain things, that

7     certain things are true and that they have agreed in advance in

8     order to save time and resources that they will not dispute and

9     so they get together and record that agreement in what is called

10    a stipulation.  You should accept these facts as true.  Go

11    ahead.

12         MS. ZAEHRINGER:  Entitled Stipulation, it says, "Comes

13    now the government and the defendant herein and stipulate as

14    follows:  Government Exhibit 18 containing crack cocaine was

15    seized by law enforcement officers on June 6, 2007, during a

16    search warrant at 13 Holiday Lodge Road in North Liberty, Iowa.

17    That the cocaine base, also known as crack cocaine, was

18    submitted to the Iowa Division of Criminal Investigation

19    Laboratory in Ankeny, Iowa, and that a qualified criminalist,

20    Peter Wagner, determined that the substance was, in fact,

21    cocaine base.  The parties stipulate and agree that a copy of

22    that report, completed by Mr. Wagner, may be marked as an

23    exhibit and admitted into evidence along with the cocaine base.

24              "That after obtaining this substance law enforcement

25    officers placed this exhibit in the sole care, custody, and

1    control of an evidence custodian who kept the exhibit in a

2    secured and restricted evidence locker.  This exhibit was

3    removed from the evidence custodian for use in this proceeding.

4    That said exhibit is in the same or substantially same condition

5    as when it was originally obtained.  The parties agree that

6    there is a reasonable probability that this exhibit has not been

7    changed or altered and this is a proper foundation.  The parties

8    agree that the exhibit may be admitted into evidence without

9    further foundation.

10           "The parties further stipulate that a proper

11   foundation and chain of custody exists for all of the

12   government's proposed exhibits, that they are authentic, and

13   that accordingly those exhibits are what they purport to be and

14   should be admitted into evidence subject only to a sustainable

15   objection unrelated to foundation, chain of custody,

16   authenticity, or hearsay:

17           "That by the signature below defendant affirms as true

18   and correct only the facts contained herein.  This stipulation

19   does not infer any criminal liability to any of the referenced

20   controlled substance," and it is signed by the defendant,

21   defense attorney, and myself.

22           THE COURT:  In that stipulation it says that the crack

23   is Exhibit 18, but that is the analysis.  What is the exhibit on

24   the crack?

25           MS. ZAEHRINGER:  13, Your Honor.

1      THE COURT:  Very well.  Would you pass the Exhibit 13

2  among the jurors?  That has been admitted, hasn't it?

3      MS. ZAEHRINGER:  Yes, Your Honor.

4      THE COURT:  We don't send contraband back for your

5  examination during deliberations.  A lot of people just want to

6  see what crack looks like.  That's why I always ask that they do

7  that during trial.

8  BY MS. ZAEHRINGER:

9      Q.   During your drug investigations do you see often that

10  dealers put their names on items, assets?

11     A.   Sometimes, but generally no.

12     Q.   And what is the purpose of not putting your name on

13  assets?

14     A.   I would assume to conceal their identity from us and

15  distance themselves from those assets that we -- that we in law

16  enforcement aren't able to connect with them.

17     Q.   What about cell phones?  Are cell phones --

18     A.   The same, they don't -- obviously in their business

19  they don't want us being able to track them and most savvy drug

20  dealers are aware that we do track cellular phones.

21     MS. ZAEHRINGER:  I have no further questions.

22     THE COURT:  Counsel, can you both come up to the bench

23  just briefly?

24         (An off-the-record discussion was held.)

25     THE COURT:  Okay.  We are going to break for lunch.  I

1  wanted to visit with the lawyers about how we are doing here in

2  terms of the schedule.  We are now significantly ahead of the

3  schedule that we had anticipated.  So far ahead, in fact, that

4  Mr. Leddin had appropriately subpoenaed his witnesses for

5  tomorrow morning and can't find them or can't get them here

6  earlier than their subpoena time.  Mr. Leddin doesn't know how

7  long Ms. Zaehringer is going to ask questions, Ms. Zaehringer

8  doesn't know how long Mr. Leddin is going to ask questions, so

9  sometimes we just go either faster or slower than we anticipated

10 and that happens so we are going to come back at 1:20 after

11 lunch, we will recess very early this afternoon, we will come

12 back and finish the trial tomorrow morning.  We are very

13 confident that the case will be sbumitted to you for your

14 deliberations by lunchtime tomorrow so that's the most recent

15 update on the situation.  Thank you.  We will see you ready to

16 go at 1:20.

17             (A recess was taken from 11:57 a.m. until 1:20 p.m.)

18             (In the presence of the jury.)

19             THE COURT:  Please be seated.  Ms. Zaehringer, you can

20 continue.

21             MS. ZAEHRINGER:  I would like to move to admit

22 Government Exhibit 26, it is the stipulation.

23             MR. LEDDIN:  No objection, Your Honor.

24             THE COURT:  26 is received.

25

1    BY MS. ZAEHRINGER:

2        Q.   I want to talk to you about Mark Riley.  We heard

3    testimony about an agreement.  Did you have any agreement with

4    Mark Riley regarding his testimony?

5        A.   No.

6        Q.   Can you tell me when you first had contact with Mark

7    Riley?

8        A.   The first time I ever had contact with Mark Riley.

9    I've talked to him a few times in the past.  I know last year, I

10   believe it was June of last year, at the time when he was found

11   or charged with possession of crack cocaine he had asked to

12   speak to us in consideration -- or about that charge.  At that

13   time we did talk to him about him working for us to potentially

14   make a controlled purchase.  I don't recall who the -- who that

15   was going to be from.  That did not -- did not occur.

16       Q.   During your conversations with him did you make any

17   promises to him regarding his testimony here today?

18       A.   No.

19       Q.   Your contact with him, was that limited to the

20   cooperation he was going to do on the streets?

21       A.   Yes, it was.  It was shortly after -- there was some

22   contact with him in regards to this case, but they were

23   separate.

24       Q.   And did he end up doing a controlled buy for you?

25       A.   No.

1          MS. ZAEHRINGER:  I have no further questions.

2          THE COURT:  Mr. Leddin?

3          MR. LEDDIN:  Thank you, Your Honor.

4                         EXAMINATION

5     BY MR. LEDDIN:

6          Q.    Agent Blomgren, I would like to start off by focusing

7     on Government's Exhibit 11.  I will put it on the screen here.

8     Do you have a good view of that?

9          A.    Yes, I can see it fine.  Thanks.

10         Q.    And isn't it true that clearly it is being sent to

11    Ricardo Townsend in Chicago?

12         A.    It does say Chicago.

13         Q.    And the amount, of course, is $500 plus the $44

14    service charge with a total of $544.  Isn't it fair to state

15    that $500 is a relatively small amount of money in terms of the

16    cases that you have investigated in the past in terms of drug

17    transactions?

18         A.    I would say it's a significant amount, but it is not a

19    tremendously significant amount.

20         Q.    I mean, isn't it true that you are used to seeing

21    cases where we're talking thousands of dollars and maybe even

22    hundreds of thousands of dollars?

23         A.    It's possible, certainly.

24         Q.    And isn't it fair to say that you have no firsthand

25    knowledge as to why Mr. Townsend was -- I'm sorry, that Mr.

1   Ferguson was sending Mr. Townsend $500?

2       A.   At that time certainly no.

3       Q.   And isn't it fair to state that it is possible it

4   could have been for any reason such as payment of the rent?

5       A.   Without having spoken to Mr. Ferguson, that would be

6   possible.

7       Q.   Thank you.  Government's Exhibit 12, another Western

8   Union receipt, on here the sender, of course, is Prince -- I'm

9   sorry, the sender is DeVaughn Glee and that the receiver is

10  Monica Autrey.

11      A.   Yes.

12      Q.   Do you know who Monica Autrey is?

13      A.   No, I do not.

14      Q.   Is it possible that Monica could be DeVaughn Glee's

15  girlfriend?

16      A.   Yes.

17      Q.   Or friend or relative or really anybody?

18      A.   Yes.

19      Q.   And so you have no knowledge at all as to why DeVaughn

20  Glee was sending Monica Autrey $350?

21      A.   Correct.

22      Q.   Government's Exhibit 19, the fingerprint result, isn't

23  it true that no identifiable fingerprints were made from

24  anything found inside of the trailer at 13 Holiday Court?

25      A.   My recollection was there was a fingerprint located on

1  something.

2      Q.   And that that fingerprint did not match to anybody

3  that you know of?

4      A.   Correct.

5      Q.   And so obviously it did not match to Mr. Townsend at

6  all?

7      A.   No.

8      Q.   Concerning Government's Exhibit 5, the phone calls,

9  did you or any police officer that you have knowledge of wiretap

10  any phone calls between Mr. Townsend and Mr. Ferguson?

11      A.   No.

12      Q.   So you have no firsthand knowledge as to any of the

13  content of these phone conversations?

14      A.   Correct.

15      Q.   You have no knowledge as to why either one of them was

16  calling the other?

17      A.   Other than what maybe was told to me at a later date.

18      Q.   But you have no firsthand knowledge of anything?

19      A.   No.

20      Q.   And you personally have never purchased crack cocaine

21  from Mr. Townsend in any type of undercover capacity?

22      A.   No, I have not.

23      Q.   And no police officers or agents that you are aware of

24  in the Southern District of Iowa, none of them have purchased

25  crack cocaine as an undercover agent at all in this case?

1    A.   No.

2    Q.   And no confidential informants that you are aware of

3  in the Southern District of Iowa have ever purchased anything --

4  any type of drugs from Mr. Townsend?

5    A.   Certainly not while working with us.

6    Q.   And you have never personally seen or witnessed Mr.

7  Townsend selling any type of drugs to anyone?

8    A.   No.

9    Q.   In fact, you have never seen Mr. Townsend commit any

10  type of illegal activity?

11    A.   Personally, no, I have not.

12    Q.   And you are not aware of any police officers or agents

13  in the Southern District of Iowa having personally observed Mr.

14  Townsend committing any illegal activities?

15    A.   I think there are probably some officers out there

16  that have.

17    Q.   But you don't know that, you just -- you are just kind

18  of assuming?

19    A.   Based on reading reports.

20    Q.   You have no knowledge that -- or evidence of any

21  police officers observing Mr. Townsend doing any illegal

22  activities?

23    A.   Not personally.

24    Q.   And you have -- I mean, you didn't personally arrest

25  Mr. Townsend for any illegal activities?

1     A.   No, I did not.

2     Q.   And you are not aware of any police officers or agents

3  in the Southern District of Iowa having arrested Mr. Townsend

4  for any illegal activities?

5     A.   Actually I am aware of that.

6     Q.   Well, you are not -- there's been no federal agents or

7  police officers in the Southern District of Iowa who have

8  arrested Mr. Townsend for any type of drug activity, isn't that

9  true?

10    A.   No, it's not true.

11    Q.   Really?  Isn't it true that Mr. Townsend has not been

12 arrested in the Southern District of Iowa for selling any type

13 of drugs?

14    A.   I believe you asked if he had been arrested for any

15 kind of drug activity.  I believe he has.  As far as selling

16 drugs, not to my knowledge.

17    Q.   So in the Southern District of Iowa you are not aware

18 of Mr. Townsend being arrested for any type of drug activity?

19    A.   I believe he was charged with possession at one time.

20    Q.   And that would show up in his records, correct?

21    A.   There should be a record of it.

22    Q.   You conducted the search of the mobile home at North

23 Liberty, 13 Holiday Court?

24    A.   I was one of the people, yes.

25    Q.   And isn't it true that there was no working power

1    inside of this residence?

2         A.   Correct.

3         Q.   And that there were only two individuals inside of the

4    mobile home, they were Sammy Glee and Jabari Roberison?

5         A.   Yes.

6         Q.   And that Ricardo Townsend was not there at all?

7         A.   Correct.

8         Q.   And that obviously you heard Officer Bernhard say that

9    he saw Sammy Glee try to hide marijuana?

10        A.   Yes.

11        Q.   And obviously you heard him say that it was clearly

12   right in front of Mr. Glee?

13        A.   Yes.

14        Q.   And that you had an opportunity to talk to Jabari

15   Roberison when you showed up?

16        A.   I did not.  Another officer did.

17        Q.   And that you are aware that Jabari Roberison admitted

18   that he was smoking marijuana inside of the residence?

19        A.   Yes.

20        Q.   And you found -- was it you or did you personally find

21   the 29.6 grams of crack cocaine?

22        A.   No, I did not.

23        Q.   It was another officer who had?

24        A.   Yes.

25        Q.   And that you are aware that this 29.6 grams of crack

1    cocaine was found in the same area where Mr. Glee was arrested?

2        A.    Yes, it was in the same room.

3        Q.    And you actually prepared a report of this incident at

4    13 Holiday Court?

5        A.    I did.

6        Q.    And isn't it true that Ricardo Townsend's name was not

7    mentioned even once in the report that you prepared?

8        A.    I don't recall, but -- if you read it and it says it

9    is not in there, I believe that.

10       Q.    So for clarification purposes in the report that you

11   prepared, Ricardo Townsend's name is not mentioned once in this

12   report?

13       A.    Correct.

14       Q.    Turning to the last page of your report, isn't it true

15   that under Sammy Glee's name you state specifically, "Found in

16   possession of approximately 29 grams of crack cocaine?"

17       A.    I'd have to look at it, but it is very possible.

18       Q.    I can put it up here on the screen for you.

19            MS. ZAEHRINGER:  Objection, Your Honor.

20            THE COURT:  Prior inconsistent statement of the

21   witness is hearsay.  You can show it to him.

22            MR. LEDDIN:  Yes, Your Honor.

23            THE WITNESS:  Yes.

24   BY MR. LEDDIN:

25       Q.    So you put in the last page of your report under Sammy

1  Glee's name, "Found in possession of approximately 29 grams of

2  crack cocaine?"

3      A.   Yes.

4      Q.   And then on the same page under Jabari Roberison's

5  name, you put down, "Associate of Sammy Glee and present where

6  approximately 29 grams of crack cocaine was found?"

7      A.   Yes.

8      Q.   And that you or another officer charged both Jabari

9  Roberison and Sammy Glee with possession of controlled

10 substance?

11     A.   They were charged with possession of marijuana.

12     Q.   Isn't the official charge possession of controlled

13 substance?

14     A.   I suppose it depends on how you write it.  I wouldn't

15 write it that way myself.  I didn't prepare those charges that

16 night though.

17     Q.   Well, isn't it stated here in your report that they

18 were both charged with possession of controlled substance?

19     A.   I'm not really sure exactly how I worded it, whether

20 it was possession of marijuana or possession of controlled

21 substance.

22     Q.   And to your knowledge isn't it true that both

23 individuals pled guilty to that offense?

24     A.   I don't know how that case was disposed of.

25     Q.   Obviously you have talked to Mark Riley at least once,

1  if not several times, correct?

2       A.   Correct.

3       Q.   And that Mr. Riley is working with you in some type of

4  capacity?

5       A.   He never actually did.

6       Q.   Well, he's here today, of course, testifying for the

7  government.

8       A.   Yes.

9       Q.   And obviously you have had some type of conversation

10  with him concerning that testimony.

11      A.   Briefly, yes.

12      Q.   And obviously you heard his testimony, he is under the

13  assumption that he could -- he's going to get some type of

14  benefit for testifying here today.

15      A.   I believe his words were he hoped he would.

16      Q.   Okay.  Well, weren't his words also that he thought he

17  could get a dismissal of his pending possession of controlled

18  substance charge?

19      A.   I'm not exactly sure how he worded that.

20      Q.   Isn't it fair to say that Mr. Riley is under the

21  impression that he could get a dismissal of that pending

22  possession of controlled substance charge for testifying here

23  today?

24      A.   He might be under that impression.

25           MR. LEDDIN:  Thank you.  I have no further questions.

1          THE COURT:  Ms. Zaehringer?

2

3                    FURTHER EXAMINATION

4     BY MS. ZAEHRINGER:

5          Q.    In looking at Exhibit 19, the fingerprint report, the

6     fingerprint that was found was on what object?

7          A.    It was on the baggie that contained the black tar-like

8     substance.

9          Q.    The print that was found -- it was found not to match

10    Jabari Roberison and Sammy Glee, is that correct?

11         A.    That's correct.

12         Q.    Was that fingerprint matched to see whether it

13    belonged to the defendant?

14         A.    No, it was not.

15         Q.    When you write a report regarding activities, do you

16    write about the people that are there and the events that are

17    going on?

18         A.    Yes.

19         Q.    If that particular report then has significance to

20    another case, what do you do with that report?

21         A.    A lot of times I'll make reference to the other case.

22         Q.    And in this particular case this report on this

23    incident ended up in the investigation of Ricardo Townsend?

24         A.    Yes, it did.

25         Q.    Could more than one person be charged with possession

1 of a controlled substance, of an amount of controlled substance?

2     A. Yes, they can.

3     Q. Just because you charge one person with possessing

4 this object, you can still charge another one?

5     A. Yes.

6     Q. Based on the circumstances of the case?

7     A. Yeah, it depends on the circumstances, of course, but

8 it certainly is possible.

9     Q. Do you recall Mr. Riley's testimony where he indicated

10 that if you wanted to get the charges dismissed, that you could

11 probably do that?

12     A. Yes, I do.

13     Q. Do you recall Mark Riley indicating that he was going

14 to get a dismissal of the charges?

15     A. No.

16     Q. You were asked whether you knew of the defendant being

17 arrested in reference to any other drug charges.

18     A. Correct.

19     Q. Do you have knowledge of that?

20     A. Yes, I do.

21     Q. And when do you have knowledge that the defendant was

22 arrested for drug charges?

23     THE COURT: Let's not go there.

24     MS. ZAEHRINGER: I have no further questions.

25     THE COURT: Mr. Leddin, anything else?

1          MR. LEDDIN:  No, Your Honor.

2          THE COURT:  Thank you.  You are excused.

3          THE WITNESS:  Thank you.

4          THE COURT:  Ms. Zaehringer?

5          MS. ZAEHRINGER:  I have no further evidence.  The

6    government would rest.

7          THE COURT:  Members of the jury, the government has

8    rested meaning it has completed the presentation of its

9    evidence.  As I told you, Mr. Leddin has subpoenaed a couple

10   witnesses for first thing tomorrow morning.  He can't get them

11   here this afternoon and it is understandable.  I am sorry

12   because we like to keep you busy from 9:00 in the morning right

13   till 5:00 in the afternoon, but we are just not -- we just went

14   faster than any of us predicted here today so I am going to

15   excuse you till nine o'clock tomorrow morning.  As I said, I am

16   very confident that this case will be submitted to you for your

17   deliberations by lunch tomorrow.

18          Fight that natural tendency that we all have to want

19   to make up our minds.  There's a number of things left to happen

20   in this trial and before you make up your mind, you want to hear

21   all of them.

22          With that, I thank you and excuse you till nine

23   o'clock tomorrow morning.

24          (Outside the presence the jury.)

25          THE COURT:  Please be seated.  Mr. Leddin, do you have

1  Motions you wish to make?

2       MR. LEDDIN:  Yes, Your Honor.  At this time I would

3  like to make a Motion for a Directed Verdict based upon the

4  evidence or the lack of evidence presented.  Essentially the

5  State's case rests on the testimony of several witnesses.  I

6  believe cross-examination has established that although the

7  witnesses obviously made some type of deals or arrangements with

8  the government, I have shown they have a motive to lie, that the

9  evidence that we do have, the crack cocaine, was found in

10  possession of two individuals that are both charged with it.  My

11  client was not anywhere near the area at the time so based on

12  all of the above, I request the Court to grant a Motion for

13  Directed Verdict.  Thank you.

14       THE COURT:  Ms. Zaehringer?

15       MS. ZAEHRINGER:  Your Honor, the government has

16  established sufficient evidence in this case and the issue of

17  credibility is one for the jury to decide.

18       THE COURT:  Thank you.  At this stage of the

19  proceedings the Court takes all of the evidence in the light

20  most favorable to the government, that is the Court simply for

21  the purpose of handling this Motion believes that all of the

22  government's evidence is true.  In that light the Court finds

23  that there is sufficient evidence for the jury to be able to

24  determine that the defendant was in a conspiracy with among

25  others Daniel Binion, Prince Ferguson, Dennis Ogburn, William

1   Branch, and others.  For that reason the Motion for Judgment of

2   Acquittal is denied.

3          This morning when you got in I had the most recent

4   copy of the jury instructions on your chair.  Did you want to

5   comment any further on jury instructions?

6          MR. LEDDIN:  No, Your Honor.

7          THE COURT:  Ms. Zaehringer?

8          MS. ZAEHRINGER:  No, Your Honor.

9          THE COURT:  I think the one thing that I should add

10  would be in that Instruction No. 3 on credibility, an

11  instruction about people who testify who did not testify

12  pursuant to a Plea Agreement, but who have charges pending and

13  just to simply say that whether or not their testimony is

14  influenced by the hope of getting a Plea Agreement or a hope of

15  reduced charges is for the jury to determine.

16         Mr. Townsend, there's a number of decisions that your

17  lawyer gets to make along the way in a jury trial.  He gets to

18  decide what to ask the jurors during jury selection, he gets to

19  decide what to say in opening statement, he gets to decide when

20  and whether to object to the prosecutor's questions, and he gets

21  to decide what to say in his closing argument.

22         There's one decision that you, only you can make in

23  the final analysis and that's the decision as to whether or not

24  to testify.  We hope that you talk with your lawyer about it

25  before you finally make that decision, but you understand that

1  if you want to testify, you can?  You have to answer out loud.

2          THE DEFENDANT:  Yes, sir.

3          THE COURT:  If you testify, the jury will be given an

4  instruction that says that your testimony is to be judged just

5  like the testimony of any other witness.  If you do not testify,

6  the jury will be given an instruction that says that they cannot

7  consider or even discuss that matter in arriving at their

8  verdict.  Do you understand that?

9          THE DEFENDANT:  Yes, Your Honor.

10          THE COURT:  All right.  Have you talked with Mr.

11  Leddin about that decision?

12          THE DEFENDANT:  Yes, we talked briefly about it, yes.

13          THE COURT:  And I assume then you are going to talk to

14  him more about it yet this afternoon?

15          THE DEFENDANT:  Yes, sir.

16          THE COURT:  All right.  So tomorrow if I don't hear

17  him call you as a witness, can I assume that that was your

18  decision not to testify?

19          THE DEFENDANT:  Yes, Your Honor.

20          THE COURT:  Very well.  Okay.  So you have a couple

21  witnesses at nine o'clock tomorrow morning?

22          MR. LEDDIN:  Yes, Your Honor.

23          THE COURT:  And expect then to go to the jury soon

24  after you have completed the evidence in this case, that is we

25  won't wait till the afternoon.  You will be ready to go whenever

1  the jury is -- or whenever the evidence is complete.

2          MS. ZAEHRINGER:  Your Honor, I may have one rebuttal

3  witness.

4          THE COURT:  Sure.  Thank you.  See you in the morning.

5          (Proceedings adjourned at 1:43 p.m., February 24,

6  2009, and resumed at 8:51 a.m., February 25, 2009.)

7          (Outside the presence of the jury.)

8          THE COURT:  Please be seated.  Mr. Leddin?

9          MR. LEDDIN:  Thank you, Your Honor.  After much

10  discussion with my client and in talking to our witnesses, the

11  client has made the decision to release his witnesses from their

12  subpoenas and not have them testify this morning.

13          THE COURT:  Will you be presenting any evidence?

14          MR. LEDDIN:  No, Your Honor.

15          THE COURT:  Is that your decision, Mr. Townsend?

16          THE DEFENDANT:  Yes.

17          THE COURT:  Very well.  All right.  Let me get the

18  final version of the jury instructions for you and we will make

19  a record on those because that will be, of course, the first

20  thing that we do when we bring the jury back.  Of course, I will

21  call on you and at that time you will rest and then we will read

22  the jury instructions and have the closing arguments.  Let me

23  get those final copies for you right now.

24          (A recess was taken from 8:52 a.m. until 8:59 a.m.)

25          (Outside the presence of the jury.)

1    THE COURT:  The record can reflect that we are outside

2  the presence of the jury just prior to the reading of the jury

3  instructions at the close of the evidence.  This is that time

4  that counsel have to make a record concerning the jury

5  instructions.  Ms. Zaehringer?

6    MS. ZAEHRINGER:  Your Honor, I have no objections to

7  the final jury instructions.

8    THE COURT:  Mr. Leddin?

9    MR. LEDDIN:  I have no objection either, Your Honor.

10    THE COURT:  Very well.  As soon as copies of the jury

11  instructions get down here, we will call the jury and begin so

12  why don't you tell the jurors that it might just be a few

13  minutes late, a couple minutes late.  Thank you.

14    (In the presence of the jury.)

15    THE COURT:  Members of the jury, good morning.  We are

16  continuing on in the matter of United States of America versus

17  Ricardo Townsend.  At the end of the day, after lunch yesterday

18  the government rested.  Mr. Leddin?

19    MR. LEDDIN:  Thank you, Your Honor.  Defense rests.

20    THE COURT:  Members of the jury, the defendant has

21  rested meaning the defendant has completed presentation of his

22  evidence as well.

23    On your chair when you got back into the courtroom was

24  a copy of the jury instructions.  These are the final jury

25  instructions and so I would ask that you follow along on your

1    copy, reading along as I read them out loud.  After I read the

2    first seven of the eight jury instructions, we will hear the

3    closing arguments of the parties, then I will read number eight

4    and I don't think I need to explain the Verdict Form in this

5    case, it is very self-explanatory.

6             The court reporter doesn't need to take down the

7    reading of the jury instructions, just follow along on your copy

8    and report anyplace where I deviate from the written word.

9             (The Final Instructions to the Jury Nos. 1 through 7

10   were read by the Court.)

11            THE COURT:  Okay.  I am going to suspend my reading of

12   the jury instructions at this time so that we can hear the

13   closing arguments of the parties.  As I told you earlier, the

14   closing arguments of the lawyers are not evidence in the case.

15   However, it is an important part of the trial, it is this

16   opportunity that the lawyers have to attempt to persuade you

17   that their client's position is the one that you should adopt in

18   your deliberations.

19            Counsel for the government goes first.  It has the

20   burden of proof.  Counsel for the defendant goes second.  Each

21   side is given as much as one hour to present their closing

22   arguments.  If Ms. Zaehringer doesn't use all of her hour in her

23   initial argument, she can use part of that to give a rebuttal

24   argument so that each side can comment on each other's closing

25   arguments.

1      Ms. Zaehringer, you may make the government's closing

2  argument.

3      MS. ZAEHRINGER:  Thank you, Your Honor.  May it please

4  the Court, Mr. Leddin, ladies and gentlemen of the jury, I want

5  to first of all thank you again for the time and attention you

6  spent here the last few days.  It is a very important case and

7  we appreciate that.

8      First I want to talk to you about the elements that

9  the government must prove.  In this case it is a conspiracy and

10  if you look at the elements, there's three items the government

11  must prove beyond a reasonable doubt.

12      First, the dates starting September 2005 until January

13  2008, two or more persons reached an agreement.  We know that

14  the defendant came to the North Liberty area, set up shop.  The

15  purpose in coming to North Liberty was to sell drugs.  You heard

16  that he can make more money here than in Chicago.

17      When he came here, he hooked up with numerous

18  different people, had agreements with them.  There's no evidence

19  that the defendant had a job during this time frame, was making

20  any legitimate money.  We know the defendant had at least one

21  car.  The defendant recruited people to come from Chicago to

22  sell with him.  We know that Jock came, T-Bone came, we know the

23  defendant hooked up with Prince Ferguson, CB.  We heard that the

24  defendant set up shop in trailer number 13 and we heard that he

25  set up shop in Lakeside Apartments.

1    The government must prove secondly that the defendant

2 voluntarily and intentionally joined in the agreement or

3 understanding.  We know the defendant ran the conspiracy.  He

4 was the person that went to Chicago to get the drugs to sell in

5 the Southern District of Iowa.  He had people under him that

6 were selling for him.  Obviously the illegal activity is the

7 selling of the drugs.  We heard that there was other drugs

8 besides crack cocaine that was being distributed in the North

9 Liberty area.  This case obviously concerns crack cocaine.

10    We have to prove also that it was over 50 grams of

11 crack during the conspiracy time frame.  You heard from numerous

12 witnesses that the defendant would go to Chicago and he'd get at

13 least 63 grams a time so if you believe just one trip to

14 Chicago, we've met our burden with the 50 grams.

15    In looking at the elements, there's definitions.

16 First look at on or about.  The government doesn't need to prove

17 exact dates when the conspiracy took place.  You heard from

18 numerous individuals talking about time frames for months at a

19 time, some people were with the defendant for a year at a time.

20 The government doesn't need to prove exact dates as it is

21 charged in the Indictment.

22    Again, like I told you in opening statement, the

23 agreement doesn't need to be formal, doesn't need to be in

24 writing, doesn't need to outline every detail that goes on in

25 the conspiracy, and in the conspiracy, not every person needs to

1   know everybody involved.  You heard during cross-examination

2   that several of the witnesses didn't know the other witnesses.

3   The co-conspirators such as Ben Boyd didn't know co-conspirators

4   on the front end of the conspiracy, Binion, Ferguson.

5          You heard that during the conspiracy time frame the

6   defendant went to Chicago to get more crack cocaine and heroin.

7   During those times you heard that the defendant would take other

8   people with him.  The defendant would drop these individuals off

9   at locations and the defendant was in charge of getting the

10  crack cocaine from his source.  The defendant didn't want the

11  people under him to know who his source was perhaps so that they

12  would cut him out and go directly to his source.  He wanted to

13  keep control of the conspiracy and make his money.

14         This case relies primarily on our cooperators and you

15  heard on Monday all the cooperators that testified have Plea

16  Agreements with the government.  You heard and you will see on

17  the exhibits, the Plea Agreements that have been entered into

18  evidence, that these cooperators have obligations and they told

19  you what their obligations were.  Their obligations are to tell

20  the truth 100 percent of the time in interviews, at any time

21  they talk to any law enforcement or in court, and there's

22  consequences if they don't fulfill their obligations.  Their

23  Plea Agreements can be pulled, they won't get a sentence

24  reduction.  You heard that they are all clear on what their

25  obligations and consequences are.  You heard that they weren't

1  given any promises, they weren't told if you testify in this

2  trial you are going to get a couple years off.  They weren't

3  guaranteed anything for their testimony here today.

4          You will see in the Plea Agreements that a sentence

5  reduction will only be initiated by the government after

6  evaluating the testimony and looking at the Plea Agreements, the

7  defense attorney pointed out the Stipulation of Facts.  Clearly

8  the defendant's name is not in the Stipulation of Facts.  You

9  will see that the Stipulation of Facts are not a document that

10  shows every transaction that that defendant did.  You will see

11  that it is a summary of the activities.  Just because the

12  defendant's name is not in there does not mean that he is not

13  part of the conspiracy.  But what you will also see in the Plea

14  Agreements is that the Plea Agreement names the co-conspirators

15  and states and others.  By that alone that makes this a

16  nonissue.

17          This case boils down to the credibility of the

18  witnesses, whether you believe these cooperators, and if you

19  look at their testimony and compare it to the rest of the

20  evidence, the other testimony that you heard, you will see that

21  it is consistent with each other.  The big facts are consistent,

22  even down to the little details are consistent.

23          First we have everybody is consistent on what drug the

24  defendant is selling, heroin, crack, powder.  You didn't hear

25  any of the witnesses come up here and say that the defendant was

selling marijuana or Ecstasy or meth.  You heard several witnesses testify that the defendant lived in North Liberty in the Savannah townhomes.  Some witnesses were shown pictures of this place, other people described it as exactly what you will see in the picture.  Witnesses knew that he lived here with his girlfriend and some of them even knew that he had kids there. We know that there was a search warrant done in August of 2007 where there was evidence that the defendant was living there. There were nine pill bottles there, prescriptions.  That obviously shows that he's there.   Why else would there be prescription medication at this residence?

We also have the driver's license that shows the defendant put that address down for his Iowa address.  We have the water bill that shows that Rice was living at that apartment or that townhouse since at least 2005, and we have the North Liberty officer who told you that he saw the defendant's car there on numerous occasions.

The evidence also clearly shows that the defendant owned trailer number 13.  We have the title that shows that, we have Prince Ferguson saying that he lived there, and that's further confirmed by the documents that were found during the search warrant in June of 2007 that Prince Ferguson did, in fact, reside there.  We have the defendant's name as a co-applicant on the paperwork supplied by the trailer park.

In June 2007 we know that Cuzzo was at that trailer,

1  Sammy Glee, as well as Jabari Roberison.  Witnesses told you

2  that, in fact, they were associated with the defendant.

3  Witnesses told you that they bought out of the trailer, one of

4  them being Scott Schalla, he lived in the trailer park himself,

5  he would go down to the trailer and pick up drugs.  And we heard

6  from Binion and he told you that in late 2006 he called the

7  defendant, he needed I believe he said a half ounce, he didn't

8  want to make a trip to Chicago, he had already split off from

9  the defendant, but knew the defendant was in town, so he called

10  the defendant up and the defendant told him to go over to the

11  trailer to pick up the drugs.  That was in late 2006.

12         Other information that you learned from the witnesses

13  that is consistent is the fact the defendant goes to Chicago.

14  We heard Daniel Binion, he told you that the defendant and he

15  went six to seven times to Chicago.  Ferguson told you that he

16  went with the defendant eight to ten times.  And again they both

17  describe the scenario that the defendant drops them off, picks

18  them up after he has obtained the drugs.  We know it is

19  consistent between those two that the amount of drugs the

20  defendant would pick up is at least 63 grams, that's what they

21  were getting personally.

22         Another fact that is consistent among the witnesses is

23  the group that the defendant formed in the North Liberty area.

24  He called it Ground Zero.  He had several people under the group

25  Ground Zero.  The purpose of Ground Zero's business?  Sell

drugs.  We have Jock, we have the Montgomery brothers, T-Bone,
Mike, Cuzzo, Ferguson, and others.  These people working under
him are making deliveries for him at the direction of him.
Another thing that shows us that this, in fact, is a group that
was formed is the tattoo that you saw on Prince Ferguson and the
exhibit that shows a similar tattoo denoting the group Ground
Zero.

Other testimony that is consistent is we heard from
Ben Boyd and Davis who goes by Frenchie, they were -- told you
about their dealings with the defendant in 2007, they told you
at times they would pool their money, they knew each other was
dealing with the defendant, they were buying lesser amounts from
the defendant to sell themselves or to support their habit, but
certainly they were dealing with the defendant.

Some other minor facts that are consistent from the
witnesses that you heard from, one being that the defendant
owned the silver gray Dodge Magnum.  You heard numerous people
talk about that.

Let's look at the testimony of Miranda Lalla.  She
came in, she told you she is not getting anything from her
testimony.  Actually she told you that she was getting something
from her testimony, she was getting something personal in her
recovery by doing this.  But she did tell you she wasn't getting
anything from the government for her testimony.

Another point I want to make is that if you look at

1  the relationship between the defendant and the witnesses that

2  you heard from, we have Binion, he told you that he had a long

3  relationship with the defendant, that they both came from

4  Chicago, they were gang members in Chicago.

5          You heard from Ogburn.  He knew him even longer.  He

6  said that he knew him when they were younger even.  They

7  associated together in Chicago, they both ended up in the North

8  Liberty area.  In fact, Ogburn told you that in January 2006

9  when he came back to the North Liberty area, that it was the

10  defendant that got him back on his feet.  The defendant gave him

11  drugs to sell so that he could get back in the game, back making

12  money.

13          And Ferguson, we all know Ferguson's relationship with

14  the defendant, obviously very close.  Ferguson and the defendant

15  have tattoos that are the same.  Ferguson told you he didn't

16  want to testify against the defendant.  He didn't go to the

17  police and blurt out information regarding this defendant.  He

18  waited till the authorities asked him about it.  He then

19  complied with his Cooperation Plea Agreement and gave all the

20  information that he knew on the defendant.

21          When evaluating the credibility of the witnesses, you

22  also need to look at the demeanor of the witnesses and how they

23  testified on the stand.  Were they evasive?  Did they stall when

24  answering questions?  You can make that determination and I

25  think you know that if a person is up there being evasive or

1 stalling, then that may mean that they're not being truthful.

2 Did you see that in any of the witnesses?  I submit that all the

3 witnesses up there answered the questions they were asked, they

4 didn't hesitate, they didn't stall, I would submit to you that

5 that shows that they're not falsifying their answers, they're

6 not having to think of a false answer to say.

7 The evidence is clear that this defendant was involved

8 in the conspiracy.  This conspiracy occurred over numerous

9 months, years, involved a lot of drugs, a lot of crack cocaine

10 was distributed, and headed by the defendant.  The defendant

11 brought workers to the North Liberty area so that he could

12 distance himself and have them do the legwork.  It is clear that

13 a conspiracy existed between the defendant and many of the

14 witnesses that testified.  I ask you now to look at all the

15 evidence and find the defendant guilty.  Thank you.

16 THE COURT:  Mr. Leddin, you may make Mr. Townsend's

17 closing argument.

18 MR. LEDDIN:  Thank you, Your Honor.  May it please the

19 Court, Ms. Zaehringer, ladies and gentlemen of the jury.  In

20 this case the government wants you to overlook the fact that

21 they do not have any real evidence against Mr. Townsend.  After

22 listening to the testimony of all the witnesses from the

23 government, the following facts are undisputed:  The police

24 never observed Mr. Townsend selling any crack cocaine.  The

25 police never heard him selling any crack cocaine.  The police

1   never found any crack cocaine on him.  The police never

2   purchased any crack cocaine from him.  The police have no

3   videotapes of him selling crack cocaine.  The police have no

4   audiotapes of him selling crack cocaine.

5        The government wants you to convict Mr. Townsend on

6   this conspiracy charge based solely on the testimony of their

7   witnesses.  Well, let's take a closer look at their witnesses.

8   I am going to refer to their first group of witnesses as the

9   chain gang.  Daniel Binion, otherwise known as Daniel Lucas and

10  Frank White.  Current gang member.  Four prior felony drug

11  offenses, including selling drugs to a minor.  Sold crack

12  cocaine in Johnson County in 2005 and 2006.  Pled guilty to

13  conspiracy to distribute crack cocaine.  Facing mandatory life

14  in prison.  Made a deal to cooperate with the government in

15  exchange for a substantial reduction of his sentence.

16  Previously testified for the government in exchange for a

17  reduction of his sentence.  And he expects to receive another

18  reduction of his sentence for testifying at this trial.

19       Dennis Ogburn.  Current gang member.  Three prior

20  felony drug offenses.  Felony convictions for forgery, burglary,

21  and robbery.  Sold crack cocaine in Johnson County from 2002 to

22  2006.  Pled guilty to conspiracy to distribute crack cocaine.

23  Facing mandatory life in prison.  He made a deal with the

24  government in exchange for a substantial reduction of his

25  sentence.  He previously testified for the government in

1  exchange for a reduction of his sentence.  And he expects to

2  receive another reduction of his sentence for testifying at this

3  trial.

4          Prince Ferguson.  Two prior felony drug offenses.

5  Felony convictions for theft.  He sold crack cocaine in Johnson

6  County from 2004 to 2006.  He pled guilty to conspiracy to

7  distribute crack cocaine.  He is facing mandatory life in

8  prison.  He made a deal to cooperate with the government in

9  exchange for substantial reduction of his sentence.  He

10  previously testified for the government and received a reduction

11  of his sentence and he expects to receive another reduction of

12  his sentence for testifying at this trial.

13          William Branch, otherwise known as Kung Fu.  One prior

14  felony drug offense.  Felony convictions for robbery, armed

15  robbery, extortion, assault with dangerous weapon.  He sold

16  crack cocaine in Johnson County from 2005 to 2007.  He pled

17  guilty to conspiracy to distribute crack cocaine.  He is facing

18  a minimum of 20 years in prison and a maximum of a life

19  sentence.  He made a deal to cooperate with the government in

20  exchange for a substantial reduction of his sentence.  He

21  previously testified for the government in exchange for a

22  reduction of his sentence and he expects to receive another

23  reduction of his sentence for testifying at this trial.

24          Fredrick Boyd.  Two prior felony drug offenses.  He

25  sold crack cocaine in Johnson County from 2006 to early 2008.

1  He pled guilty to distributing crack cocaine.  He is facing a

2  minimum of 20 years in prison and a maximum of a life sentence.

3  He pled guilty to cooperate with the government in exchange for

4  a substantial reduction of his sentence.  He previously

5  testified for the government in exchange for a reduction of his

6  sentence and he expects to receive another reduction of his

7  sentence for testifying at this trial.

8        Daniel Davis, otherwise known as Frenchie.  One prior

9  felony drug offense.  He sold crack cocaine in Johnson County

10  from 2006 to 2007.  He was charged with conspiracy to distribute

11  crack cocaine.  He is facing a minimum of 20 years in prison and

12  a maximum life sentence.  He made a deal to cooperate with the

13  government in exchange for a substantial reduction of his

14  sentence.  He previously testified for the government and

15  received a reduction of his sentence on his previous drug felony

16  offense and he expects to receive a reduction of his future

17  sentence for testifying at this trial.

18        Obviously all of these people have a strong motive to

19  lie.  They are currently incarcerated for many, many years.

20  None of them want to be in prison.  They all know that the only

21  way that they are going to get out of prison early is testifying

22  for the government.  They would testify against their own

23  mothers if it meant getting out of prison early.  Obviously due

24  to their situation they are not credible witnesses.

25        The government's second group of witnesses are not in

custody; however, the government still had to make deals with them to get them to testify at this trial. Let us call this group of witnesses the deal makers.

William Schalla. Felony convictions for fraudulent practices and burglary. He has a pending felony theft charge in Johnson County. He is facing a maximum of five years of incarceration. He made a deal to cooperate with the government after he was charged with this theft offense. He became a paid informant for the government. He testified for the government at this trial and three prior hearings. Ask yourselves, what is going to happen to this pending theft offense?

Miranda Lalla-Houser. Felony conviction for theft. Four prior drug convictions. She is currently in drug court in Johnson County. If she is removed or kicked out of drug court, she is looking at a maximum sentence of five years of incarceration. She admitted to Agent Blomgren that she sold crack cocaine. This is a potential charge of conspiracy to distribute crack cocaine. This is also a potential jail sentence of 10 years hanging over her head. So what does she do? She made a deal to cooperate with the government and to testify at this trial. Ask yourselves, is she going to be charged with conspiracy to distribute crack cocaine?

Last but not least, Mark Riley. Pending charge of possession of controlled substance in Johnson County. He talked to Agent Blomgren after his arrest on this possession charge.

1  All of a sudden he decided to cooperate with the government and

2  testify at this trial.  He got up on that stand and he testified

3  that Agent Blomgren is going to help him out with this current

4  possession charge if he cooperates and he testifies.  I wonder

5  what is going to happen to that pending possession charge.

6         These witnesses also have a strong motive to lie.

7  They face pending or potential charges.  They face potential

8  jail time.  They all made deals with the government in exchange

9  for a dismissal of the pending charges or better yet, no charges

10 being filed at all against them.  None of these witnesses are

11 credible either.

12        The police found crack cocaine in the mobile home

13 owned by Mr. Townsend; however, Mr. Townsend never lived in this

14 mobile home.  He always lived in Chicago.  He came to Iowa to

15 occasionally visit Litkesha Rice and his four children.  The

16 government's only reliable witness, Marci Stanfield, testified

17 that she only saw Mr. Townsend at the mobile home a few times.

18        Now, this is a woman who worked at the mobile home

19 park for five years and she was there Monday through Friday and

20 this office was located directly across from the mobile home.

21 Now, if she -- now, if Mr. Townsend would have been present at

22 this mobile home more than a few times, she would have seen him

23 and she would have told us on that stand.

24        Mr. Townsend rented the mobile home to Shonna Stanley.

25 Ms. Stanley filled out and signed the Holiday Mobile Home Park

1  agreement which is Exhibit 7.  She also signed the Holiday

2  Mobile Home Court rules and regulations which is also a part of

3  Exhibit 7.  Miss Stanley was living at this mobile home, not Mr.

4  Townsend.

5          The crack cocaine found by the police either belonged

6  to Miss Stanley, her boyfriend Prince Ferguson, Sammy Glee, or

7  Jabari Roberison.  When police entered the mobile home, they

8  found Sammy Glee trying to conceal drugs and they found Jabari

9  Roberison in the back flushing the toilet multiple times,

10 probably trying to hide drugs.

11         The police found the crack cocaine in the area of

12 where Sammy Glee was.  The police report prepared by Agent

13 Blomgren listed Sammy Glee as possessing this crack cocaine.

14 Well, Sammy Glee and Jabari Roberison were charged with

15 possession of controlled substance.  Agent Blomgren never

16 mentioned Ricardo Townsend's name anywhere in the report that he

17 prepared for that incident.  The crack cocaine did not belong to

18 Mr. Townsend.

19         The most important evidence in this case is the

20 Stipulation of Facts which are attached to the Plea Agreements

21 and admitted into evidence as Exhibits 1, 2, 3, 8, and 9.  Each

22 stipulation contains a summary of the facts describing each

23 defendant's role in the conspiracy offense.  It also lists the

24 names of the different people involved in this conspiracy.

25 Approximately 20 different names are listed in these

1   stipulations and some of these names are mentioned numerous

2   times.  Ricardo Townsend's name is not mentioned once in any of

3   these stipulations.

4        Now, the Stipulation of Facts is a very important

5   document.  It was drafted by the government, it was reviewed and

6   signed by each defendant, the defendant's attorney, and the

7   government and each stipulation was presented to the Court and

8   became an official part of the Court record for each defendant

9   involved in the conspiracy.  If Ricardo Townsend was part of

10   this conspiracy, his name would have been mentioned in these

11   stipulations several times.

12        In this case the government has failed to prove by

13   proof beyond a reasonable doubt that Mr. Townsend conspired to

14   distribute crack cocaine in the Southern District of Iowa.

15   Based upon the evidence and the lack of evidence presented by

16   the government in this case, I am asking each one of you to

17   return with a verdict of not guilty.  Thank you.

18        THE COURT:  Ms. Zaehringer, you may make the

19   government's rebuttal argument.

20        MS. ZAEHRINGER:  First of all, I want to talk to you

21   about the search warrant on June 6, 2007, at the trailer, Number

22   13.  Why do we know that's the defendant's?  First of all he

23   owns the trailer, we know he let his runners use the trailer,

24   Prince Ferguson, and he, in fact, lived there for a couple

25   months.  We know that after he moved out the defendant's

1  associates moved in and were dealing out of there.   The crack

2  was found in a Folgers coffee can.  Ferguson told you that's how

3  the defendant stored his drugs.

4        Branch testified that he had bought out of that

5  trailer from two brothers.  We heard and saw a Western Union

6  from a Glee, a DeVaughn Glee, and we know that Sammy Glee was

7  present in the trailer at the search warrant.

8        We also have the fact that the officer, North Liberty

9  officers saw the defendant's car at the trailer on occasion and

10 we are not saying -- we never argued that the defendant lived at

11 that trailer.  It is apparent that he got that trailer for one

12 purpose, to get his workers in there, to set up shop, but he as

13 a savvy drug dealer distanced himself from the trailer.  He

14 didn't want to be where the approximately 36 grams of crack was.

15 He was living a couple miles away in North Liberty with his

16 girlfriend and four kids.  Ask yourself where did Sammy Glee,

17 Cuzzo, and Roberison get the drugs?  They got the drugs from the

18 defendant.

19       One thing you don't need to decide in this case is

20 where the defendant was living.  It doesn't matter whether he

21 was living in Chicago, whether he was living in North Liberty

22 which the evidence points to at the townhouses, certainly the

23 evidence doesn't show you that the defendant was living at the

24 trailer.  It doesn't -- that's not part of the conspiracy.  I

25 don't have to prove where he was living.

1    We know that he stayed in North Liberty with his

2  girlfriend, people dropped him off there, people picked him up

3  there, officers saw his car there, evidence of him were there in

4  August 2007.  Clearly he was there.  Whether he lived there, it

5  doesn't matter.  If you want assume that he lived in Chicago, he

6  took numerous trips to Chicago, once a week, more than once a

7  week, it simply doesn't matter where he was living.  Certainly

8  he was getting the drugs from Chicago, bringing them to North

9  Liberty for his workers and himself to distribute.

10    Why doesn't the government have recordings of

11  transactions between the defendant and confidential informants?

12  Why don't we have videotape or wire taps as the defense attorney

13  asked you?  Agent Blomgren told you why we don't have that.

14  Confidential informants are -- people that the officers wanted

15  to use as confidential informants were afraid of the defendant.

16  They didn't want to go in and buy from him.

17    Another reason, the people that the defendant worked

18  with, Ferguson, Ogburn, Binion, they got locked up before the

19  defendant did.  They're off the streets now.  We don't let them

20  out to go buy from the defendant.  They remain in custody so

21  there's nobody out there to buy from him.

22    But what we do have during the investigation is people

23  talking about the defendant.  The investigators start hearing

24  information in 2006, developed through the arrest of different

25  people, more statements from users and from dealers, and we

1  learn where the defendant fits into this drug conspiracy.  The

2  investigative tool used in this case is the collection of all

3  the interviews, putting the pieces together, finding out where

4  the defendant fits, and as you know, the defendant fits at the

5  top.

6          Going back to the trailer evidence, June 6, 2007.

7  Even if you don't believe that that evidence ties to the

8  defendant, even though there is evidence beyond a reasonable

9  doubt that it does, but even if you throw that out, what are we

10 left with?  We're left with a lot of witnesses talking about a

11 lot of crack cocaine, well over 50 grams.  The government's case

12 is not relying on that search warrant and if you have any

13 question about that, the other evidence is sufficient.

14         One other point I want to make.  The Plea Agreements

15 that the cooperators have, you can look at them, it spells out

16 the obligations and consequences like I told you before.  The

17 cooperators hope to get a reduced sentence.  That's normal.

18 Everybody wants to better themselves, to get better deals for

19 themselves.  But look at the consequences and think to yourself

20 is it worth them getting a longer sentence to come in here and

21 not be truthful, not follow their obligations.  I submit to you

22 that those witnesses came in knowing what their obligations are,

23 they fulfilled their obligations according to the Plea

24 Agreement, and that's for you to decide whether they are

25 credible and I submit to you that that is an obvious answer.

1        I ask you to find the defendant guilty.  Thank you.

2        THE COURT:  Members of the jury, if you pick up your

3 instructions and turn to Instruction No. 8, we will finish the

4 reading of the instructions.

5        (Final Instruction No. 8 was read to the jury by the

6 Court.)

7        THE COURT:  To each of your copies I have attached a

8 copy of the Verdict Form.  It is very self-explanatory.  I think

9 you know what to do or how to fill it out.  I don't need to

10 explain that to you.

11        Shortly after you retire to begin your deliberations,

12 we will send a copy of the exhibits that were admitted into

13 evidence in for your use in deliberations.  The original copy of

14 the Instructions together with the Verdict Form that you should

15 use to record your verdict is in this white three-ring notebook.

16        We want you to be comfortable here and to have access

17 with your work and your family and your friends while you are

18 serving on jury duty.  That's why we permit you to have and

19 carry your cellular telephones when you are on jury duty.  It is

20 very important to the integrity of the jury verdict that there

21 be no opportunity for outside influence to be brought on the

22 deliberations while you are deliberating.  For that reason we

23 will ask that you not bring your cellular telephone into the

24 jury deliberation room while you are deliberating.

25        The Court Security Officer has a nice little ledge to

1  keep them on so as you go back in, before you begin your

2  deliberations, you might just want to call your work or your

3  family and say that you will be out of communication for a

4  couple hours and then if you take a break over the lunch hour,

5  if you are here, feel free when you are not deliberating to use

6  your phone just to check messages and stuff.  If you want to

7  tell them that if it is an emergency, they can call our Clerk's

8  Office, we would get a message to you and that's fine; but while

9  you are deliberating, we do not allow cell phones.

10          For the same reason, we want you to bring reading

11 material if you like to read during your jury duty, there's a

12 lot of periods where you are sitting back there in the jury room

13 and just waiting for us; but from time to time we find that the

14 back of the Newsweek has a big article about crack cocaine or

15 something associated with the case and so we ask that you not

16 have those kind of reading materials that you brought along with

17 you as well.  Again, the reason for that is the importance of

18 protecting the integrity of jury verdicts.

19          When you are deliberating, all 12 of you must be

20 together.  So if someone goes to the bathroom or if the Court

21 Security Officer takes someone out on the back dock for a

22 cigarette and you are not -- all 12 of you are not together,

23 your deliberations stop.  Okay?  So you only discuss the case

24 when all 12 of you are together.  For that reason if you are

25 deliberating over the lunch hour, we will have lunch brought in

1    for you at no cost.

2          I want to emphasize the one instruction that says that

3    I am not encouraging or discouraging communications with me, but

4    there is only one way to do it, and that is a written note

5    signed by one or more jurors.

6          The last thing that I do before sending you out is my

7    least favorite job and that is excusing the alternate juror.  We

8    absolutely have to have an alternate juror.  If one of your cars

9    broke down on the way this morning to court, if one of your

10   family members got sick or if you got sick or if anything

11   happened, we need to continue on with this trial and so we

12   absolutely have to have at least one alternate juror to make

13   sure that we get through the trial in the event of some

14   unfortunate problem; but it is the alternate's -- it is the end

15   of the alternate's service in this case.

16         I call it the least favorite part of my job because if

17   you come every day and you sit and you listen attentively to the

18   case, it is a bummer not to be able to finish it out with your

19   fellow jurors and resolve the case.

20         Ms. Fedorchak, you are the alternate.  So as you leave

21   today, feel free to say good-bye to the others, if you leave

22   your notes with the Court Security Officer, he will make sure

23   that no one looks at them and that they are destroyed.  If you

24   want to tear them out and take them with you, that's fine with

25   me as well.  We thank you for your service in this case.  When

1   our country's independence was won, our forefathers included

2   within the Bill of Rights the Sixth Amendment which guaranteed

3   that cases such as this would not be resolved by kings or

4   presidents or judges, but rather by people selected at random

5   from the community and so by your service as well you have truly

6   lived out our United States Constitution this week and perhaps

7   or most tangible form of self-government.  I thank you for your

8   service.  Please as you leave, don't tell the other jurors what

9   your verdict might have been.

10          Okay.  So take your copy of your notes, take your copy

11  of the jury instructions, you can begin your deliberations.  The

12  exhibits will come in five, ten minutes or so.  See you then.

13          (Outside the presence of the jury.)

14          THE COURT:  Please be seated.  Don't leave the

15  courtroom without satisfying yourself that all of the admitted

16  exhibits and none of the others are sent back to the jury for

17  their deliberations.  We know where to get ahold of Ms.

18  Zaehringer, but we don't know where to get ahold of you.  Leave

19  your cell phone with Ms. Jennings.

20          We expect that you can be here within ten minutes from

21  a call.  If the jury asks a question, I will not respond to it

22  without input from the lawyers.  If I can't find you, I will

23  have to respond without your input.  The only things that I

24  respond to without input from the lawyers is if they ask for

25  additional pens or a dry marker for the white board in the jury

1  room or just absolutely mundane things like more coffee or

2  something like that we will give them if they ask.

3          The other thing I have done for the last year or so is

4  to visit with the jurors after their verdict is returned.  I am

5  less and less inclined to give lawyers and their offices

6  permission to visit with the jurors after their service is done.

7  In lieu of that, however, if you write out questions that you

8  would want answered, that you would like to know about, and give

9  them to me when you come back for the reading of the verdict, I

10 would be happy to ask them and inform you of what the jurors

11 said about those topics, but you have to have them ready to go

12 when you come back for the jury verdict.  Thanks.

13          (A recess was taken from 10:14 a.m. until 12:37 p.m.)

14          (In the presence of the jury.)

15          THE COURT:  Please be seated.  Did someone bring the

16 Verdict Form with them?  Would the foreperson go get the Verdict

17 Form?

18          Mr. Kaup, you are the foreperson?

19          MR. CARL KAUP:  Yes, sir.

20          THE COURT:  Has the jury reached a verdict?

21          MR. CARL KAUP:  Yes, sir, we have.

22          THE COURT:  Is the verdict unanimous, meaning does

23 every juror agree to it?

24          MR. CARL KAUP:  Yes.

25          THE COURT:  Please hand the Verdict Form to the clerk.

 1   In the matter of United States of America versus Ricardo

 2   Townsend, Count 1, with regard to the crime of conspiracy to

 3   distribute crack cocaine as charged in Count 1 of the

 4   Indictment, we, the jury, find the defendant, Ricardo Townsend,

 5   guilty.

 6           Interrogatory one.  We, the jury, find beyond a

 7   reasonable doubt that the amount of crack cocaine involved in

 8   the conspiracy was 50 grams or more.

 9           The Verdict Form is signed by the foreperson, dated

10   today, and signed by all 11 other of the jurors.  The Clerk of

11   Court shall file the original Instructions, the Verdict Form,

12   make it available for public inspection.

13           Mr. Leddin, do you wish to have the jury polled?

14           MR. LEDDIN:  No, Your Honor.

15           THE COURT:  Members of the jury, again, I wish to

16   thank you on behalf of the Court for the Southern District of

17   Iowa.  As I told Ms. Fedorchak, that you have come to resolve a

18   matter that could be resolved in no other way but through your

19   participation and for your service this week, we thank you.

20           I'd like to visit with you just privately for a few

21   minutes in the jury room before you leave today.  I will have a

22   chance to thank you more personally and answer any questions

23   that you have.  I will be back in just one minute so you are

24   excused.  Thank you very much.

25           (Outside the presence of the jury.)

1          THE COURT:  A status conference with Judge Shields

2     regarding the sentencing date is set for May 29th at 8:30.

3          MR. LEDDIN:  Thank you, Judge.

4          (Proceedings concluded at 12:40 p.m., February 25,

5     2009.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4          I, the undersigned, a Certified Shorthand Reporter of
the State of Iowa, do hereby certify that I was called in the
5    capacity of a Certified Shorthand Reporter to report the
foregoing proceedings in the above-captioned matter and that
6    same was taken down by me in stenotype and later reduced to
Computer-Aided Transcription under my supervision and direction,
7    and that the foregoing Partial Transcript of Proceedings is a
true record of the testimony given and all objections interposed
8    and rulings made thereon.

9

          I further certify that I am neither attorney or
10   counsel for, nor related to or employed by any of the parties to
the action in which these proceedings were had, and further,
11   that I am not a relative or employee of any attorney or counsel
employed by the parties hereto or financially interested in the
12   action.

13

          Dated at Davenport, Iowa, this 31st day of August,
14   2009.

15

16                         /s/ Linda Faurote-Egbers
                           Certified Shorthand Reporter
17                         and Notary Public
                           Linda Faurote-Egbers
18                         Notarial Seal
                           Commission Number 223944
19                         My Commission Expires 8-10-11

20

21

22

23

24

25